# Richmond.

## QUARLES v. FOWLKES.

### March 17, 1927.

1. GIFTS—*Gift Causa Mortis—Transaction Held not to Constitute a Gift Causa Mortis—Case at Bar.*—In the instant case decedent in her last illness directed her landlady to take a bag from her pillow, get the key to decedent's trunk and lock it up, "and don't let anybody get their hands on it but you." The bag contained money, certificates of deposit and a liberty bond, which constitute the subjects of the alleged gift.

   *Held:* That as the valuables were placed in the donor's trunk, which never left her room until after her death, it may well be doubted whether they were ever out of the constructive possession of the donor; but this it was unnecessary for the court to decide because the words were not words of gifts but were just as applicable to a trust or confidence as to a gift.

2. GIFTS—*Gift Causa Mortis—Proof—Case at Bar.*—In the instant case, decedent told her landlady to take a bag containing valuables and not to let anybody "get their hands on it but you." "You know what I told you to do with it." To permit the landlady to say that she was to be the beneficiary of all but an insignificant part of the alleged gift would open a wide door to fraud and violate all the rules of evidence as to the degree of proof required to establish a gift *causa mortis.* The landlady attempted to overcome this by proof of confidential talks of decedent with various friends tending to show that decedent's relations with her own family were unsatisfactory, and that they should have no part of her estate, and that she intended to give the landlady everything she had, after providing for her funeral expenses. This testimony was negatived by decedent's correspondence with her family, which showed cordial relations between decedent and her family, and there was evidence that decedent had said that her landlady was not going to get her property. The landlady's conduct after the alleged gift and after the death of donor seemed inconsistent with the existence of the alleged gift.

   *Held:* That there was no gift *causa mortis.*

3. GIFTS—*Gift Causa Mortis—Right to Make—Not Favored—Clear and Satisfactory Evidence—Uncorroborated Testimony of Donee.*—The right to

make gifts *causa mortis* is so well established that nothing short of legislation can take it away. But it affords such an opportunity for fraud and imposition upon persons in their last illness that such gifts are not favored, and nothing short of very clear and satisfactory evidence of every element requisite to establish the gift will suffice. The gift cannot be established by the sole, uncorroborated testimony of the donee.

4. GIFTS—*Gift Causa Mortis—Proof of Gift—Amount of Gift.*—At civil law five witnesses are required to establish a gift *causa mortis* and the amount of such gift was limited, but the common law does not require the gift to be executed in the presence of any stated number of witnesses and the amount of property that may be disposed of is unlimited.

5. GIFTS—*Gift Causa Mortis—Proof—Intention—Delivery.*—The common law requires clear and unmistakable proof, not only of an intention to give, but of an actual gift, perfected by as complete a delivery as the nature of the property will admit of. It not only requires the delivery to be actual and complete, such as deprives the donor of all further control and dominion, but it requires the donee to take and retain possession till the donor's death. Although the delivery may have been at one time complete, yet this will not be sufficient, unless the possession be constantly maintained by the donee. If the donor again has possession, the gift becomes nugatory, and public policy requires these rules to be enforced with great stringency.

6. APPEAL AND ERROR—*Presumption of Correctness of Decree of Trial Court—Appellant Must Show Error.*—It is always incumbent on the appellant to show error in the decree of the trial court which is presumed to be right, and this presumption is heightened in proportion to the recognized judgment and ability of the trial judge. Even when the evidence is given in the form of depositions, he generally has a personal knowledge of the known character of some of the witnesses which places him in a better position than the appellate court to weigh the testimony before him. But when the evidence is taken orally before him, he has the opportunity of seeing the witnesses and hearing them testify, and of getting a picture of the case that is not capable of transmission in print.

7. APPEAL AND ERROR—*Weight of Decree of Trial Court—Oral Evidence.*—The conclusions of the trial judge on questions of fact where the evidence is oral is entitled to peculiar weight and consideration, and ought not to be set aside in a case of doubt or uncertainty. This is peculiarly true where, as in the instant case (a case involving a gift *causa mortis*), the claimant is required in the first instance to establish his claim by clear and convincing evidence.

Appeal from a decree of the Circuit Court of Nottoway county.   Judgment for defendants.   Complainant appeals.

*Affirmed.*

The opinion states the case.

*Charles E. Pollard* and *Charles T. Lassiter*, for the appellant.

*H. H. Watson*, for the appellee.

Burks, J., delivered the opinion of the court.

This is a case of an alleged gift *causa mortis*.   There is practically no dispute about the law of the case. The subject matter of the gift and the time, place and circumstances thereof are all well within the limits governing such cases, but the fact of the gift, within the rules relating to the subject, is the subject of the gravest conflict of testimony.   The case is further complicated by the fact that much of the testimony on each side comes from witnesses who are interested in the result, and we have to look to other evidence in the record to ascertain which side is probably correct. No witness for the contestants was present when the alleged gift was made, but the contestants deny that the words used constituted a gift, and also insist that the subsequent conduct of the donee, immediately after the death of the donor, was inconsistent with the existence of the gift.

Miss Elizabeth Fowlkes, a maiden lady over sixty years of age, had resided in the city of Petersburg for thirty years, and in recent years had worked in a cigarette factory.   She was born and reared in Notto-

way county where several of her brothers and sisters resided, and when about thirty years of age had been sent to a hospital for the insane.  She remained there a year or more when she was discharged and returned home, but soon took up her residence in Petersburg, where she continued to reside till her death.  Two brothers, Truly W. Fowlkes and A. M. Fowlkes, survived her and live in Nottoway county.

Some seven years before her death she had rented a room from the appellant, Mrs. Emma L. Quarles, but took her meals out.  When she was sick, however, and unable to leave her room, Mrs. Quarles was in the habit of carrying her meals to her.  There was also living in the house with Mrs. Quarles her sister, Mrs. Kyle, who with Miss Fowlkes worked in the cigarette factory just across the street.

Mrs. Quarles, her sister Mrs. Kyle and Mrs. Moore, who rented one of Mrs. Quarles' rooms, testify that the donor, Miss Fowlkes, was quite sick on Friday, September 12, 1924, and a doctor was sent for and came about 11:30 in the forenoon, and found her dressed, lying on her bed, with a temperature of 103. After he left she soiled her clothes and these ladies prepared to undress and bathe her and make her comfortable.  In doing so, they found a string tied around her body next to her flesh, to which was attached a bag in which was contained money, certificates of deposit and a liberty bond, which constitute the subjects of the alleged gift.

They testify that Miss Fowlkes requested Mrs. Quarles to take the scissors and cut the string, and she did so, and that when the string was cut Miss Fowlkes took the bag, wrapped the string around it and handed it to Mrs. Quarles, and said:  "You take this; you know what is in it; you know I have told you what to

do with it; don't let anybody get their hands on it but you;" that Mrs. Quarles took the bag and laid it on the bed beside the pillow of Miss Fowlkes while she continued the bathing; that Miss Fowlkes said: "Now, Mrs. Quarles, you get my key out from under the corner of the trunk next to the bed, and take them and the box and lock them up, and don't let anybody get their hands on them but you," and directed Mrs. Quarles to pin the keys on Mrs. Quarles' breast— "Pin them right there until you get through." At some time later—the witnesses disagree as to the time—Mrs. Quarles did take the bag and box and place them in Miss Fowlkes' trunk and locked them up.

The alleged gift was made about 1:30 in the afternoon. Miss Fowlkes grew rapidly worse. Her temperature was 105 at 3 p. m., and she was in a state of collapse, and died about four o'clock Saturday morning. The trunk remained in Miss Fowlkes' room until after death.

Mrs. Pulley, a great niece of Miss Fowlkes, residing in Petersburg, was called over the 'phone on Friday and went to the house of Mrs. Quarles. She testified that she arrived about 1:30 p. m., that Miss Fowlkes knew what she was talking about, and that Mrs. Quarles, in the presence of Miss Fowlkes, told of cutting the string around the waist of Miss Fowlkes and of the latter winding it around the parcel and giving it to her and saying: "Take this. It is yours. Don't let anybody have it. I have told you what to do with it;" and that Miss Fowlkes nodded her head in assent.

[1] As the valuables were placed in the donor's trunk, which never left her room until after her death, it may be well doubted whether they were ever out of the constructive possession of the donor. *Hatch* v. *Atkinson,*

56 Maine 324, 96 Am. Dec. 464. It is not necessary, however, for us to decide this question in view of our conclusion on other evidence in the case.

[2] There were but three persons present when the gift was alleged to have been made—Mrs. Quarles, her sister Mrs. Kyle, and her tenant Mrs. Moore. Their statements of the language of the gift are not merely similar, but practically identical. Mrs. Quarles gives this language: "Mrs. Quarles, take this; you know what is in it and you know what I have told you to do with it. Don't let anybody get their hands on it but you." Mrs. Kyle says: "Here, Mrs. Quarles, you take this. You know what is in it. You know what I told you to do with it. Keep it and don't let anybody get their hands on it." Mrs. Moore says: "Take this. You know what is in it; and you know what I told you to do with it; and don't let anybody get their hands on it but you; and nobody must put their hands on it." These are not words of gift, and are just as applicable to a trust or confidence as to a gift. No one but Mrs. Quarles knows "what I told you to do with it," and to permit her to say that she was to be the beneficiary of all but an insignificant part of it would open a wide door to fraud and violate all of the rules of evidence as to the degree of proof required to establish a gift *causa mortis.*

She seeks to overcome this by proof of confidential talks of Miss Fowlkes with various friends, in which she spoke of her unpleasant or unsatisfactory relations with members of her own family; of her determination that they should have no part of her estate; of her obligations to Mrs. Quarles and her intention to give her everything she had after providing for definite funeral expenses and a tombstone over her grave. To Mrs. Hudgins it seemed like "she was kind of bitter against them." To Mrs. Kyle it appeared that "she felt that

they were strangers to her," and "were not entitled to anything" of her estate; that "they had neglected her quite a bit." To Mrs. Moore she confided: "I just cannot stay where they are at," and "that her people did not treat her right." To Mrs. Quarles, the complaints of bad treatment of her family were frequent, and the desire was expressed that they should get no part of her estate, but that Mrs. Quarles should have it for caring for her. There is no evidence of any protracted sickness of the donor prior to her last illness which lasted less than a week.

The correspondence between Miss Fowlkes and members of her family absolutely negatives any such feeling towards her kindred as that expressed above. That class of people do not write a great deal, and the letters from her brothers were usually written by their wives, and the letters to them were addressed to the husband and wife. They breathe an atmosphere of cordiality and friendship, and the letters of the nieces and nephews to Miss Fowlkes are of like character, each showing an interest in the surroundings and affairs of the other. One of these letters to her brother, Truly W. Fowlkes, and his wife is dated July 11, 1924, and another to her brother, Asa, and his wife is dated July 13, 1924, exactly two months before her death. They are both of the same nature. The latter is quoted in the margin to show the state of feeling existing between the parties.[1]

---

[1]                                        "316 Brown St.,
                                           "Petersburg, Va.,
                                              "July 13, 1924.
"DEAR SISTER EARLY & BRO.,
    "I got to Petersburg all O. K. about 20 minutes past 3 o'clock. We had quite a nice ride to Petersburg. They all enjoyed the apples and peaches coming back, and I thought the little baby would go crazy over the peaches. It commenced to rain a little bit before we got to Petersburg and after I got in the house it rained real hard. So they were not bothered at all there and back. Had good luck all the way. I certainly did enjoy my

These expressions of cordiality and affection on the part of the donor sweep from under the witnesses for the donee the foundation for the motive for the gift to Mrs. Quarles. Not only is there this evidence from the lips of the donor, but the testimony of Dr. Nixon, a wholly disinterested witness, who testified that on September 1, 1924, Miss Fowlkes came to consult him at his office, and while there stated to him amongst other things, "that Mrs. Quarles knew she had some money, and that she thought she was going to get it, but that she was not." This evidence would seem to be a sufficient answer to the suggestion that there was a motive for the gift to Mrs. Quarles and a fixed determination that her kindred should not inherit any of her property.

The conduct of Mrs. Quarles after the gift and after the death of the donor seems inconsistent with the existence of the gift. The two brothers of the donor were notified of her illness on Friday night and they went to Petersburg early the next morning, arriving there somewhere between seven and nine o'clock. They went to the house of Mrs. Quarles and found that their sister had died about four o'clock in the morning. There were present at that time Mrs. Quarles, Mrs. Kyle, Mrs. Pulley and Thomas Harding, son of Mrs. Quarles. The

visit to you and I am coming to see you again. Tell Mozel the boys asked me who she was. Said she was very pretty and I forgot to make them acquainted so you must excuse me. I certainly do like Truly's wife, and the boys are so nice. Margaret is very pretty. Truly, Jr., is so nice and the little ones are so sweet. I am so glad you all can make a good living.

"I feel like I can go back to work. I think I am much stronger than I was. I do not know when I ever enjoyed myself any more than I did with you. You must kiss Vivian and Cornell for me. I think of you all every day. I think you have a beautiful home. I went out to Wilcox's lake yesterday. It is cool out there.

"I miss you all so much. It has been cloudy all day and now it is raining real good. I hope this month will not be as wet as June. You must be sure to write to me real soon. Give love to each one.

"From your fond sister,
"SARAH E. FOWLKES."

parties are in direct conflict as to what took place in the conversation which ensued when the two brothers arrived. Mrs. Quarles and the others who have been mentioned as present state positively that Mrs. Quarles informed the two brothers that during the previous day their sister, Miss Sallie Fowlkes, had tied around her body a bag containing valuables which constituted the gift; that she requested that the string be cut, and that when this was done, she wrapped the string around the bag and handed it to Mrs. Quarles, using practically this language: "You take this, you know what is in it, you know what I told you to do with it. Don't let anybody get their hands on it but you." The two brothers positively denied that any such statement was made to them.

It will be observed of these witnesses that there were on one side Mrs. Quarles, her sister Mrs. Kyle, her son Thomas Harding, and Mrs. Pulley, who was a great-niece of the donor. On the other side were the two brothers, and, as stated, they were directly in conflict as to what was said. Her two brothers testified that when they went to Mrs. Quarles' house on Saturday morning, among other things, they asked whether their sister had made any requests, and she said that Miss Fowlkes had told her she wanted to be buried in Blandford cemetery, what kind of casket she wanted to be buried in, and what kind of robe she wanted, and that she further said: "She left some money, but I do not know just how much." One of them stated that he would like to know how much she left. They both positively said that she made no mention of any gift to her of the money. It will thus be seen how directly in conflict these witnesses are.

The two brothers then went to the undertaker's to see about arranging for the funeral and while there

spoke to the undertaker about the money that their sister had left and made some inquiry as to what he thought was best to do with it.  The money was then in a trunk in the room where the remains of their sister lay.  The brothers then returned to Mrs. Quarles' house, and with them were D. H. Reams, the undertaker, and J. P. Marshall, a great-nephew of Miss Fowlkes and brother of Mrs. Pulley.  Mr. Truly Fowlkes then told Mrs. Quarles that Mr. Reams had taken up with the clerk's office the matter of money left by his sister, and that the clerk advised that the money should be put in some place until the court could determine how it should be disposed of.  Reams testified that Mrs. Quarles made no objection whatever to turning the money over to Truly Fowlkes and that she asserted no claim of any gift to her of the property. J. P. Marshall also testified that she did not make any claim whatever to the money.  The two brothers made the same statement.  Mrs. Quarles delivered the keys to Mrs. Pulley, and she unlocked the trunk and took the money and securities out, which were counted and listed by Thomas Harding and turned over to Truly Fowlkes, who deposited the same in bank.

Miss Fowlkes was buried at two o'clock on Sunday, and Mrs. Quarles took dinner that day at the house of Asa Fowlkes, a brother of the donor.  While there some mention was made of the money left by Miss Fowlkes and of what, if any, debts were owing by Miss Fowlkes, but no reference whatever was made by Mrs. Quarles to the fact that any gift had been made to her.

On the following Wednesday, Truly Fowlkes and Asa Fowlkes went to Petersburg, along with J. M. Jones, cashier of the First National Bank of Crewe,

and they carried with them Samuel Nicholson and
D. H. Reams.   They went at once to Mrs. Quarles'
house to make a search to find if any will had been
made by Miss Fowlkes, but found none.   No one else
was present at the time except Mrs. Quarles.   Jones
testified that in the conversation at that time he did
not hear Mrs. Quarles lay any claim to the money,
that the only thing he heard her say was that this
money was handed to her for safekeeping.   He was
also asked the following question:   "Did she make
any statement to Mr. Fowlkes or to anyone else in
your presence that Miss Sallie had given her this
money, and that it was hers, and that she was going
to require it to be placed in the bank for the court to
decide whether it was hers or not," to which he replied:
"No, sir."

Nicholson testified that Mrs. Quarles had said that
Miss Fowlkes had said to her that she did not want
any of her people to have anything that she had.   He
was then asked:   "Did she lay any claim to this
money as her own?" to which he replied: "No, sir;
the only thing she said touching that at all was, as I
have stated, that Miss Fowlkes gave her that and told
her to keep that and not to let anybody have it."
He was further asked:   "Did she state in your presence
that she had delivered the money to Mr. Fowlkes with
the distinct understanding that she claimed the money
as her own; that steps would be taken to determine
her right to the money, and pending such determina-
tion the said property would be placed in bank to the
estate of Miss Sallie E. Fowlkes?" to which he replied:
"No, sir; there was not anything said along that line
at all."

Reams testified on this subject as follows:

"Q. What happened and what conversation do you

recall took place between Mrs. Quarles and those gentlemen?

"A. Mrs. Quarles gave the gentlemen every assistance that she possibly could to locate the will; and finally, after it appeared to be a hopeless task, she said: 'Gentlemen, I do not like to say this, but Miss Sallie did not want to let her relatives have one cent or anything else that she left.

"Q. Did she say anything then about the money having been given to her?

"A. I think not. I have no positive recollection of it.

"Q. Was that the first time that you had heard her state anything about Miss Sallie not wanting them to have the money and that she claimed her title to it?

"A. Yes, sir; that is the first that I heard of the money over to Mr. Fowlkes.

"Q. She did not make any objection, I understand, no protest, and placed no conditions on the delivery of the money when it was handed over to Mr. Fowlkes?

"A. No, sir; she was just as nice about it as she possibly could be.

"Q. Did she express herself as being gratified at its being taken away?

"A. Yes, sir. I will not quote her words, but she said: 'Well, I am glad to be relieved of the responsibility of this money until the court can determine what to do with it.' That was the substance of it, if not the words.

"Q. Did she make any claim whatever or suggestion that she laid any claim to it?

"A. No, sir."

The disinterested testimony clearly shows that Mrs. Quarles did not at this time claim that the money

had been given to her.   In addition to this, Dr. Nixon
testified that Miss Fowlkes called to see him at his
office on September 1, 1924, and, in the course of the
conversation, made the following statement:

"She said that she wanted to consult a physician,
and that Mrs. Quarles did not want her to go out to a
physician, particularly to me, and that she had to
sneak out; and she told me not to tell Mrs. Quarles
anything about it, not to mention it to her at all; and
in the course of the conversation she said that she
had a little money and that Mrs. Quarles knew she
had some money, and that she thought she was going
to get it but that she was not.   That is what she
stated to me at that time."

When Dr. Nixon was called to see Miss Fowlkes on
September 12, 1924, about 11:30 a. m., he found her
condition serious, with a temperature of 103.   His
next visit was at 3:00 p. m. when he found her in a
state of collapse, mental condition extremely poor,
temperature 105, and "virtually dying."   The alleged
gift was between these two visits, about 1:30, and
witnesses for the donee testify as to her mental capa-
city at that time.

The mental and physical condition of the donor
at the time of the gift, the language of the supposed
gift, the relations of the donor to her next of kin and
to Mrs. Quarles, and the conduct of Mrs. Quarles
subsequent to the gift, are matters which have had
our careful consideration, and have led us to the con-
clusion that the donee has not established the gift by
that clear and satisfactory evidence which is required
in cases of this kind.

[3, 4, 5] The right to make gifts *causa mortis* is so
well established that nothing short of legislation can
take it away.   But it affords such an opportunity

for fraud and imposition upon persons in their last illness that such gifts are not favored, and nothing short of very clear and satisfactory evidence of every element requisite to establish the gift will suffice. The gift cannot be established by the sole, uncorroborated testimony of the donee. The right is said to have been borrowed from the civil law, where the gifts were limited in amount, and five witnesses were required to establish the gift. When transferred to the common law, no such restrictions were placed upon it, and now estates of any amount may be so transferred.

In *Thomas* v. *Lewis*, 89 Va. 1, 15 S. E. 389, 18 L. R. A. 170, 37 Am. St. Rep. 848, the estate so transferred amounted to $200,000. It is manifest, therefore, that courts must be careful to see that the gift is proved clearly, plainly and unequivocally. See 12 R. C. L. 973, section 45.

We approve what is so well said in *Hatch* v. *Atkinson*, 56 Me. 324, 326-7 (96 Am. Dec. 464):

"Gifts *causa mortis* are not favored in law. They are a fruitful source of litigation, often bitter, protracted and expensive. They lack all those formalities and safeguards which the law throws around wills, and create a strong temptation to the commission of fraud and perjury. Lord Hardwick declared, more than a hundred years ago, that it was a pity the statute for the prevention of frauds and perjuries did not set aside all such gifts. Justinian was so justly apprehensive of fraud with respect to them that he required them to be made in the presence of five witnesses. If the law limited such gifts to articles of small value, and required the gift to be executed in the presence of distinterested witnesses, they would be less objectionable. But if large estates, amounting to thou-

sands of dollars, may be thus disposed of, and the title of the donee supported mainly by his own testimony, and that of near relatives, the public feeling of security may well be startled.

"Unfortunately the common law has not adopted any of these precautions. It does not require the gift to be executed in the presence of any stated number of witnesses; nor does it limit the amount of property that may be thus disposed of. But it does require clear and unmistakable proof, not only of an intention to give, but of an actual gift, perfected by as complete a delivery as the nature of the property will admit of. It not only requires the delivery to be actual and complete, such as deprives the donor of all further control and dominion, but it requires the donee to take and retain possession till the donor's death. Although the delivery may have been at one time complete, yet this will not be sufficient, unless the possession be constantly maintained by the donee. If the donor again has possession, the gift becomes nugatory and public policy requires these rules to be enforced with great stringency, otherwise the wholesome safeguards of our testamentary laws become useless. It is far better that occasionally a gift of this kind fail, than that the rules of law be so relaxed as to encourage fraud and perjury."

Upon the printed record as it appears before us, we are, to say the least of it, doubtful if the gift has been proved with that certainty and clearness required by law. But we have not had the opportunity afforded the trial court of having the witnesses before us and of seeing them and their demeanor on the stand, and of hearing them testify, and in reviewing its decision must give due weight to this consideration.

[6, 7] It is always incumbent on the appellant to

show error in the decree of the trial court which is presumed to be right, and this presumption is heightened in proportion to the recognized judgment and ability of the trial judge. Even when the evidence is given in the form of depositions, he generally has a personal knowledge of the known character of some of the witnesses which places him in a better position than the appellate court to weigh the testimony before him. But when the evidence is taken orally before him, he has the opportunity of seeing the witnesses and hearing them testify, and of getting a picture of the case that is not capable of transmission in print. His conclusions in such case, on questions of fact, are entitled to peculiar weight and consideration, and ought not to be set aside in a case of doubt or uncertainty. This is peculiarly true where, as in the instant case, the claimant is required in the first instance, to establish his claim by clear and convincing evidence. Upon a review of the whole case, we find no error in the decree of the trial court.

Many cases on the subject of gifts *causa mortis* have been cited in argument and on the briefs, but the principles are well settled in this State. There is no conflict of opinion between counsel as to their interpretation or application, and we have not deemed it necessary or desirable to review or even to cite them. We have deemed it best to rest the case on the application of familiar principles to the evidence as adduced on the trial.

*Affirmed.*