# Wytheville

## FLORENCE S. THOMAS V. THE FIRST NATIONAL BANK OF DANVILLE, EXECUTOR OF J. M. THOMAS, DECEASED.

June 11, 1936.

Present, Holt, Hudgins, Gregory, Chinn and Eggleston, JJ.

The opinion states the case.

*Meade, Meade & Talbott,* for the appellant.

*Harry Wooding, Jr.,* and *Harris, Harvey & Brown,* for the appellee.

CHINN, J., delivered the opinion of the court.

The appellant, Florence S. Thomas, is the widow of J. M. Thomas, who died in the city of Danville on November 28, 1934. The couple had been married thirty-one years and had no children.

On July 9, 1929, the decedent wrote a will in his own handwriting, naming the First National Bank of Danville, the appellee, as his executor, and giving his wife certain real estate and personal effects, an income of $500 per month, and further providing that she should have the power to will away half of his estate remaining at her death, the rest of it to be divided among his brothers and sisters. On March 10, 1934, Thomas suffered a severe hemorrhage which caused him to be taken to a hospital in Danville for examination. After remaining there several weeks he was advised by Dr. Upchurch, a specialist on urinary diseases, that he had a cancerous tumor. Shortly afterwards, on April 24, he executed a holograph codicil to his will, by which it was provided that his wife should under no circumstances receive less than $500 per month, and the right previously given to his wife to dispose of one-half of his estate remaining at her death was revoked.

Thomas owned 250 shares of the stock of the Tate & Thomas Co., Inc., a corporation doing business in Danville, Va. The total outstanding issue of this stock was 1,000 shares, of which J. R. Tate, a life-long business friend and associate of Thomas, owned the other 750 shares. Sometime after Thomas suffered the hemorrhage, referred to, he told Tate that he wanted to transfer this 250 shares of stock in Tate & Thomas Co., Inc., to his wife, and asked Tate if he thought it could be done without going to the "regular expense." Tate advised him how he thought it could be done, and Thomas afterwards told Tate that he had transferred the stock to his wife. In making the transfer Thomas did exactly what Tate told him to do.

Thomas conducted a business in the city of Danville under the firm name and style of J. M. Thomas & Co., and maintained an office at his place of business. On May 5, 1934, Thomas, at his said office, assigned and transferred in blank on the back thereof the certificate for 250 shares of Tate & Thomas Co., Inc., standing in his name, with

Mrs. P. J. Burton, his secretary, as a witness to his signature. At the same time Thomas also signed the following typewritten memorandum on the stationery of J. M. Thomas & Co.: "The enclosed stock, 250 shares of Tate & Thomas Co., Inc., and gold bond No. 167, for $1,000 of the Masonic Building Corporation is the personal property of my wife, Florence Thomas." His signature to this paper is also witnessed by Mrs. P. J. Burton, who typed the document. This writing along with the stock certificate and the Masonic Building Corporation bond referred to therein, were placed in a plain white envelope which was sealed and addressed in Thomas' own handwriting, "Mrs. J. M. Thomas." This envelope was placed in a lock box in Thomas' safe in which he kept his private papers.

It appears that after the hemorrhage suffered by Thomas on March 10, 1934, he was continuously under the care of his doctors but grew steadily worse. In April his local physician took him to Richmond and placed him in the care of a specialist in that city, where he stayed some time under treatment for his ailment without any improvement resulting from it. After undergoing treatment at his home and in Danville and Richmond hospitals for several months, he finally became confined to his bed about the middle of July, and from that time on was unable to go to his office or attend to his business.

After he became confined to his bed and while at his home Thomas told his wife, in effect, that the Tate & Thomas stock he had given her was hers to sell or use as she pleased, and said, "You will not have any trouble with that because it is all sealed in an envelope and addressed to you."

About the middle of July, after "he knew he was down for good for sometime," Thomas gave his wife his bunch of keys, among which was the key to the locked compartment in the iron safe at his store, and told her to take care of them for they would mean a great deal to her if anything happened to him, "for the keys there in that bunch open the box in which there are private papers

left for you." On a number of subsequent occasions Thomas charged his wife as to the importance of taking good care of the keys for the same reason. It does not appear what other keys were in the bunch referred to except that there were keys to the front and back doors of the Thomas residence. From that time Mrs. Thomas kept the keys exclusively in her possession by locking them in her wardrobe or carrying them in her pocketbook. In August Mr. Thomas was again taken to Richmond for treatment. He was accompanied by Mrs. Thomas, who carried the bunch of keys with her. In reply to the question whether Mr. Thomas mentioned the keys while he was at the hospital in Richmond on this occasion, Mrs. Thomas said: "Well, the very morning we got there Dr. Geisinger took him for a cystocopic examination, and of course it was very trying and very painful and for several days he was right sick, but after he rallied from that, one of his first questions was to me, 'Florence, where are your keys?' I said, 'Jim, I had them in my purse but they were heavy. I have them locked up in my trunk over at the boarding house,' and he said, 'Remember those keys are very precious for you to hold, for you might need them in order to get in the box in my safe to give you possession of what I told you I have left you in the box.' "

A day or two after Thomas' death, while Mrs. Thomas was confined to her bed under the care of a doctor and nurse, she was requested to deliver the keys to the First National Bank of Danville, the executor named in the will, and thereupon got up from her bed, unlocked her wardrobe and gave the keys to J. R. Tate for the executor.

L. C. Horne, assistant trust officer of the bank, and J. R. Tate went to Thomas' place of business and with the use of one of the keys on the bunch he had gotten from Mrs. Thomas gained access to the locked compartment in Thomas' safe. Among the papers there was found the white sealed envelope addressed, "Mrs. J. M. Thomas," in her husband's handwriting. Before examin-

ing the contents of the safe, Tate notified L. C. Horne that he would probably find there an envelope addressed to Mrs. Thomas containing the Tate & Thomas stock. Upon finding the envelope Horne handed it to Tate who refused to open it because he thought it belonged to Mrs. Thomas, but it was then opened by Horne without Mrs. Thomas' knowledge or consent, and was found to contain the certificate of Tate & Thomas stock assigned in blank under date of May 5, 1934, the Masonic Building Corporation bond, the memorandum executed by J. M. Thomas, witnessed by Mrs. P. J. Burton and described above, and two certificates of ownership of certain patent rights issued to Mrs. J. M. Thomas and held by her husband for safekeeping.

The bank refused to deliver Mrs. Thomas the Tate & Thomas stock and the bond, and on December 18, 1934, instituted this suit to obtain a construction of Thomas' will, and also the determination of the court as to the ownership of the Tate & Thomas stock and the Masonic Building Corporation bond.

Upon the hearing of the cause the court decided that the Tate & Thomas stock and the Masonic Building Corporation bond belonged to the executor of J. M. Thomas and not to his wife, and from that decree Mrs. Thomas took this appeal.

It is contended by the appellant that the Tate & Thomas stock and the Masonic Building Corporation bond were the subject of a gift *causa mortis,* or a gift *inter vivos,* from her husband to her, but the chancellor of the court below took the view that the facts in the case showed the intention on the part of J. M. Thomas to make a testamentary disposition of this property rather than a gift *causa mortis,* or a gift *inter vivos.*

The question to be determined is, therefore, whether the facts show a gift *causa mortis* or a gift *inter vivos,* as contended by the appellant, or whether they merely show an abortive attempt on the part of Thomas to make a testamentary disposition of the stock and bond, as held by the trial court.

In 12 R. C. L. 931, this is stated: "With respect to the gifts known to the law as *inter vivos* and *mortis causa,* it may be said that they have many essential elements in common, and that the rules of law applicable to rights under them are frequently applied interchangeably. There is no distinction between these two classes of gifts as to the necessity of the intent to transfer title and the delivery of the property, the main difference between them being that where there is a gift *inter vivos* the change in the title is irrevocable and indefeasible, while in the case of a gift *causa mortis* it must have been made upon apprehension of death from present sickness and the change in the title is revocable and defeasible upon certain conditions. A condition may be annexed to a gift *causa mortis,* but not to a gift *inter vivos.* The fact that the donor is near death is not of controlling importance in determining whether the gift is *causa mortis* or *inter vivos;* while a gift made during a last illness, and when all hope of recovery is gone, is presumed to have been *causa mortis,* yet a gift of personal property made with the intent to take effect immediately and irrevocably, and fully executed by complete delivery, is binding as a gift *inter vivos,* even if the donor was *in extremis* and died soon after."

In other words, the common elements necessary to constitute a gift *causa mortis,* or a gift *inter vivos,* are: (1) The gift must be of personal property; (2) possession of the property must be delivered at the time of the gift to the donee, or some other for him and the gift must be accepted by the donee; and (3) the title to the property must vest in the donee at the time of the gift. To constitute a gift *causa mortis* it must be also shown in addition to the above elements, that the gift was made from apprehension of death from present sickness, i. e., *in periculo mortis.* *Johnson* v. *Colley,* 101 Va. 414, 44 S. E. 721, 99 Am. St. Rep. 884; *Thomas' Adm'r* v. *Lewis,* 89 Va. 1, 15 S. E. 389, 18 L. R. A. 170, 37 Am. St. Rep. 848; *Yancey* v. *Field,* 85 Va. 756, 8 S. E. 721.

It is contended by the appellee that while the evidence justifies the conclusion that Thomas intended his wife should take possession and acquire title to the stock and bond in question, at his death, it does not establish a gift *in praesenti,* which is necessary to constitute a gift of either class.

The evidence clearly shows that when Thomas spoke to Mr. Tate on the subject, he wanted to give the stock in question to his wife to take effect at once, and when he carried out Tate's directions he thought, as did Tate, that he had accomplished this. Aside from the parol evidence on the subject, the paper executed by Thomas and witnessed by Mrs. Burton shows that it was Thomas' purpose to transfer the immediate title in the stock and bond to his wife, and not that her title was only to take effect at his death. The language of the memorandum plainly declares that the stock and bond contained in the envelope *is* the property of Mrs. Thomas, and he endorsed the assignment on the back of the certificate of the stock in order to effectuate this intention. It would only have been necessary for Mrs. Thomas upon procuring possession of these papers to have filled in the blank transfer on the back of the certificate with her name, as she was given authority to do by the memorandum filed with the certificate, in order to have the stock transferred to her on the books of the company. He told his close friend Tate before the above transfer was made that he wanted to give his wife the stock and afterwards informed him he had done so. After May 5, 1934, he told his trusted employee, J. W. Wall, that he had given his wife the Tate & Thomas stock, and he discussed the transaction with his secretary, Mrs. Burton, who witnessed the transaction. There can be no doubt that Thomas intended the ownership of the stock to pass to his wife on May 5, 1934.

· ██ The case of *Thomas' Adm'r* v. *Lewis,* 89 Va. 1, 15 S. E. 389, 18 L. R. A. 170, 37 Am. St. Rep. 848, which "by general consent has come to have the force of authority on this subject" (*Shankle* v. *Spahr,* 121 Va. 598, 93 S. E.

605, 608), established the rule in Virginia that constructive delivery of stock is established when the key by which actual possession of the stock may be obtained is given to the donee by the donor with the intention of making a gift of the stock.

"Delivery of personal property is essential to a gift whether *inter vivos* or *causa mortis,* but it is not essential in either case that it be simultaneous with the words of donation. It may either precede or succeed the words. If it precede the words, so that the property is already in the possession of the donee, no new delivery is necessary; if it succeeds the words, it makes perfect that which was before inchoate." *Carradine* v. *Carradine's Estate,* 58 Miss. 286, 38 Am. Rep. 324. It is said, however, that this rule has been modified in Virginia to the extent that in cases of gifts *causa mortis* previous possession as bailee is insufficient without new delivery. "Gifts of Personalty," Chas. A. Graves, 1 Va. Law Reg. 873, 874.

The question then arises whether Thomas gave Mrs. Thomas the key for the purpose of consummating the gift of the stock and bond which he had transferred to her. The only evidence on the subject is that furnished by Mrs. Thomas and the surrounding facts and circumstances. The testimony of Mrs. Thomas shows that her husband did not give her the bunch of keys until about the middle of July, 1934. She says that when he first gave the keys to her he told her they would mean a great deal to her if anything happened to him. He told her before they left for Richmond in August, 1934, that she must take good care of the keys "for the keys there in that bunch open the box in which there are private papers for you." And again, while they were in Richmond the last time, he asked her, "Florence, where are your keys?" I said, 'Jim, I had them in my purse but they were heavy, I have them locked up in my trunk over at the boarding house,' he said "Remember those keys are very precious for you to hold for you might need them to get in the box in my safe to give you possession of what I told you I have left you in the box."

The above quoted language on the part of Mr. Thomas seems to us to plainly indicate that he had on his mind the fact that the stock and bond he had transferred to his wife and placed for her in the safe was not accessible to her without the key to the box, and that he wanted her to have the key in order that she might obtain actual possession of the stock and bond when she saw fit to do so, or if anything happened to him, and it was for this purpose that he gave her the keys which gave her the opportunity to obtain such possession. The evidence shows that the office safe in which the stock and bond were deposited was opened every day by Mr. Thomas' employees for the purpose of getting access to the books and papers necessary to carry on his business and that Mrs. Thomas could, by use of the key, have gained access to the box at any time she saw fit during business hours when the safe was open, without assistance from any source. Thomas knew this, and it seems apparent, considering the words he used when, he gave her the keys and all the surrounding facts and circumstances, that his only purpose was to give his wife right of control and dominion over the stock and bond which he had previously assigned to her, without the necessity on her part of having to resort to the aid of any person or to legal measures in order to obtain it.

It is argued and so held by the trial court that Thomas gave the bunch of keys to his wife merely for safekeeping. We do not think this assumption is warranted by the evidence. The evidence shows that Thomas repeatedly impressed upon his wife that this bunch of keys was very important to her for the reason that she might need them to get in the box in his safe to get possession of the property he had given her. There is no evidence to show that Thomas gave her the keys for any other purpose, nor does the evidence disclose that Thomas could have had any other reason for wanting Mrs. Thomas to keep the keys safely and in her exclusive possession. His frequent injunctions to her to safeguard the keys, as it mani-

festly seems to us, only grew out of his desire for his wife to òwn and possess the stock and bond given her.

It is contended by the appellee that Mrs. Thomas did not have exclusive possession of the keys in question and therefore the delivery of the bunch of keys did not constitute delivery of the stock and bond. There is no evidence to support this contention. It clearly appears that from the time Thomas gave his wife the keys in July, she had actual and exclusive possession of them continuously until Thomas' death, with the exception of one occasion during the last stage of his illness when Mrs. Thomas sent the keys to Mr. Tate who was requested by Thomas to bring him his will from the safe. The next day the keys were returned to Mrs. Thomas who held them from that time until Mr. Thomas' death, and after that event until she sent them to the executor at his request.

It is further argued that the gift is not valid because it was not made *in periculo mortis*. The evidence shows that Mr. Thomas suffered his first hemorrhage March 10, following a game which required considerable physical exertion, that upon being examined by urologists in Danville and Richmond he was informed that he had a cancerous tumor and from that time on was constantly under the treatment of specialists, and continuing to have hemorrhages until the middle of July, 1934, when he was compelled to give up visiting his place of business and took to his bed. While it is true that there is no direct evidence that Mr. Thomas expressed apprehension of imminent death, all the circumstances show that he knew the gravity of his disease and that it was only a question of time before it would prove fatal. To say that a man who has frequent hemorrhages as did Mr. Thomas, and was informed that they were caused by a cancerous tumor in his urinary organs had no apprehension of death from his illness, would be an unreasonable and far-fetched assumption. That Mr. Thomas knew his condition and apprehended imminent death is evidenced by his fre-

quent references to his keys in charging his wife to take good care of them as they meant so much to her in case anything happened to him. It is not necessary in order to fulfil this element of a gift *causa mortis* that the donor should be *in extremis* or that his death should immediately occur; it is only necessary that the donor be in apprehension of death from an impending sickness or peril. 12 R. C. L., p. 963.

It is argued that the statement made by Thomas to his wife when he gave her the keys, to the effect that they would mean a great deal to her if anything happened to him, shows that Thomas intended the gift to take effect at his death and the gift was, therefore, intended to be testamentary. This very language, however, constitutes the distinction between a gift *inter vivos* and a gift *causa mortis,* in showing that there was a condition attached to the gift.

In *Johnson* v. *Colley,* 101 Va. 414, 44 S. E. 721, 722, 99 Am. St. Rep. 884, it is said:

"It is insisted that the language of the donor, 'if I die or anything happen to me,' which accompanied the delivery of the money, was a condition attached to the gift that it was not to take effect until the donor's death and shows that a testamentary disposition was intended, and not a gift *causa mortis*. The language used by the donor is but the expression of the condition attached by implication of law to every gift *causa mortis*—that it does not take effect absolutely and irrevocably except in case of the death of the donor. It is not necessary that the donor should express the condition, but, if he does so, it tends to make plain the character of the gift rather than to cast doubt upon it."

Looking at the evidence in connection with the surrounding circumstances, we think it shows that Mr. Thomas intended to make his wife a gift *causa mortis* of the stock and bond in question, and the same should be upheld.

Finally, it 'is contended by the appellant that Mrs.

Thomas is not a competent witness under Code section 6212, and her evidence should, therefore, be excluded, and her case in consequence must fall to the ground. Said section provides:

"Neither husband nor wife shall, without consent of the other, be examined in any case as to any communication privately made by one to the other while married, nor shall either be permitted, without such consent, to reveal in testimony after the marriage relation ceases any such communication made while the marriage subsisted."

It appears that when this suit was brought Mrs. Thomas was advised by the executor that it would be unnecessary for her to employ counsel or make an appearance in the case, but in the course of the proceedings she was called as a witness by the executor and examined as to the communications had with her husband in his lifetime relative to the Tate & Thomas stock. Subsequently she was advised that it would be necessary for her to employ counsel to protect her interest, whereupon she filed an answer, and again testified and was cross-examined on the same subject, without any objection on the part of the appellee. The objection to her testimony was made for the first time in the brief of the appellee filed in this court, and it is contended by counsel for the appellant that objection to her competency had been waived, and it is also too late under Rule XXII of the court to make the objection. For reasons presently stated, we deem it unnecessary to pass upon these points.

This court has never construed the words "communications privately made" as contained in the above statute and the question, therefore, is one of first impression. We are, however, of the opinion, that the inhibition of the statute is not applicable to the case at bar under the circumstances. The question is, of course, whether Mr. Thomas' communications to his wife in regard to the stock and bond deposited for her in his safe should be considered as "privately made" within the purview of the statute.

 Webster's New International Dictionary (2d Ed.), defines the word *Private* as follows: "Not publicly known, not open, secret; as a private conversation. Confidential." And in the same Work the word *Privately* is thus defined: "In a private, secret, or unofficial way."

 Considering the meaning of the language in the statute in the light of the above definitions, the word "privately" as used in the statute is intended, we think, to be synonymous with *confidential*. In other words, the communications referred to were intended to mean those of a secret nature between husband and wife. In the instant case Thomas told his friend Tate that he wanted to give his wife the stock, and that he had done so. He told his secretary, Mrs. Burton, all about it, and he told his employee, Mr. Wall, that he had given his wife the stock. There was, therefore, certainly nothing private or confidential in the statement made by Mr. Thomas to his wife in regard to the gift of the stock, and his statement to her when he gave her the keys, to the effect that she must take care of them because they were the means by which she could get actual possession of the stock, was only a continuation of the same subject.

 As we view the statute the admissibility of communications between husband and wife was not intended to depend upon whether the communication was made in the presence of some third person, but upon the nature of the communication—that is, whether it was intended to be secret or confidential, or a communication to which those attributes do not attach. Upon careful consideration of the question involved, we do not think the testimony of Mrs. Thomas in the instant case is barred by the statute in question.

For the foregoing reasons, the decree complained of will be reversed, and the case remanded to the court below to be therein proceeded with in accordance with the views expressed in this opinion.

*Reversed and remanded.*