## CIRCUIT COURT OF CHESTERFIELD COUNTY

John S. Smart,
Adm'r of the Estate of
William D. Yee, a/k/a Dun Wai Yee

v.

S. Hing Woo

February 19, 1993

Case No. CH89–1637

BY JUDGE RANDALL G. JOHNSON

This is a declaratory judgment action brought by the administrator of the estate of William D. Yee. The administrator seeks (1) a declaration that the defendant, S. Hing Woo, is not entitled to receive any part of the estate to satisfy a check in the amount of $80,000 which was given to her by Yee before his death but which was never cashed; (2) a judgment against Woo for $44,600, plus interest, representing the amount received by Woo from two other checks given to her by Yee and cashed by Woo after Yee's death; and (3) a declaration that Woo has no interest in certain securities and bank accounts which were listed in Yee's name at his death, but to which Woo claims to have made significant cash contributions. In her amended cross-bill, Woo seeks a declaration that (1) she is entitled to receive $80,000 from Yee's estate to satisfy the $80,000 check given to her by Yee; (2) she is entitled to keep the $44,600 obtained by her when she cashed the other two checks given to her by Yee; and (3) she has an interest in the aforementioned securities and bank accounts listed only in Yee's name. The parties have submitted trial briefs, and an ore tenus hearing was held on February 4.

William D. Yee died on March 29, 1989. He was, and Woo is, of Chinese ancestry, a fact the court mentions only because of what Woo claims are important cultural traditions and superstitions which sup-

port certain of her positions in this case. Yee and Woo were lovers and had been for nearly twenty years. They often lived together and held themselves out as husband and wife, Yee even giving Woo a wedding band which she wore. Woo's family also treated Yee as though he were Woo's husband, Woo's mother giving Yee birthday and New Year's presents normally reserved, according to Woo, for sons-in-law under Chinese tradition. On the other hand, Yee had little or no contact with his own family, most of whom lived in New York and Canada. In fact, testimony from Woo and others indicated that there were ill feelings between Yee and his family growing out of a dispute over his grandfather's property after the grandfather's death in or around 1973. Apparently, Yee had no "family feelings" toward his own family after that time.

Yee and Woo worked at the Waikiki Restaurant on Midlothian Turnpike, a business which Woo's father had set in motion prior to his death around 1975 or 1976. On March 27, 1989, two days before his death, Yee called Woo at the restaurant and told her he felt "terribly bad," that he had a "heaviness" in his chest, and that he believed he would die. That night, he came to the restaurant and gave her two checks, one for $42,700 drawn on an account at Signet Bank, and one for $80,000 drawn on an account at Central Fidelity Bank. At the time he gave her the checks, he told her that if he died, he wanted her to be taken care of; he wanted her to be provided for. On March 28, 1989, one day before his death, Yee gave Woo a third check, this one for $1,900 and drawn on a different account at Central Fidelity. At the time he gave her the check, Yee was "sweating all over" and said he felt "terribly bad." As noted, Yee died the next day. After Yee's death, Woo cashed the $42,700 check and the $1,900. check. The $80,000 check was never cashed.

With regard to the securities and other bank accounts which were listed solely in Yee's name at his death, Woo claims that such securities and accounts were established and maintained for the purpose of the couple's buying a home after they were married. In fact, there was testimony from Woo's family, a construction company employee, and the former administrator of Chesterfield County that Yee and Woo had invested money together and had begun making plans to purchase a lot and build a house. Woo claims that the total so invested, plus accrued earnings and interest, was a little over $53,000 at the time of Yee's

death and that her contributions to that fund entitle her to one-half of it. The administrator says Woo is entitled to nothing.

## 1. *The Checks*

With regard to the three checks which Yee gave to Woo, the obvious question is whether they constitute valid gifts causa mortis; that is, gifts given in contemplation of death. Such gifts are specifically recognized in Virginia:

> A gift causa mortis is a gift of personal property made by a party in the expectation of death, then imminent, and upon the essential condition that the property shall belong fully to the donee in case the donor dies as anticipated leaving the donee surviving him and the gift is not in the meantime revoked.

*King v. Merryman*, 196 Va. 844, 855, 86 S.E.2d 141 (1955) (*quoting* 9 Michie's Jurisprudence, *Gifts*, § 34, p. 209, *now* 9A Michie's Jurisprudence, *Gifts*, § 34, p. 237).[1] In order to be a valid gift causa mortis, several things are necessary. Obviously, the intent to make a gift must be present. *See e.g., Brown v. Metz*, 240 Va. 127, 131, 393 S.E.2d 402 (1990); *Snidow v. First National Bank of Narrows*, 178 Va. 239, 249, 16 S.E.2d 385 (1941). In addition, three other elements are required:

> Briefly stated, the essential attributes of a gift *causa mortis* are: (1) it must be of personal property; (2) the gift must be made in the last illness of the donor, while under the apprehension of death as imminent, and subject to the implied condition that if the donor recovers of the illness or if the donee die first, the gift shall be void; and (3) possession of the property given must be delivered at the time of the gift to the donee or to someone for him, and the gift must be accepted by the donee.

*Johnson v. Colley*, 101 Va. 414, 416, 44 S.E. 721 (1903).

After considering the elements set out above and applying them to the evidence presented in this case, I hold that no valid gifts causa mortis were made.

First, the court has no problem finding that Yee fully intended to make a gift of money to Woo. The testimony of Woo and her sister,

---

[1] As noted in *King*, there are two kinds of gifts: gifts inter vivos and gifts causa mortis. As was true in *King*, Woo makes no claim of gifts inter vivos here.

which the court finds perfectly credible, easily establishes that Yee intended to give Woo the funds represented by the three checks in question. When he gave her the checks, he told her that he wanted her to be taken care of; he wanted her to be provided for. The checks were given to her for that purpose.

The court also finds that the checks were given to Woo by Yee under the apprehension that death was imminent. In this regard, the administrator argues that Yee did not truly believe he was going to die because he had made an appointment with a doctor which was to occur several days *after* he told Woo and others he thought he would die. This administrator argues that if Yee really thought he was dying on March 27 or March 28 when he gave Woo the checks, he would not have made a doctor's appointment for a later date. While there is a certain logic to this argument, the court rejects it. First, Yee never said he thought he would die "this instant" or "right now." Indeed, it is not necessary that the donor of a gift causa mortis be *in extremis* or that his or her death should immediately occur. It is only necessary that the donor be in apprehension of death from an impending sickness or peril. *Thomas v. First National Bank*, 166 Va. 497, 509, 186 S.E. 77 (1936). Moreover, many people with known terminal illnesses continue to see their doctors on a periodic basis even to the point of death. This does not diminish the fact that they are dying nor their obvious apprehension of death as imminent.

The court also makes the obvious finding that the subject of the alleged gift, money, is personal property. Accordingly, two of the three elements of a gift causa mortis set out in *Johnson v. Colley, supra*, are met. Also met is the required element of intent. The gifts fail, however, because delivery of the checks did not constitute delivery of the object of the gifts themselves; that is, the money in the bank.

The Virginia Supreme Court has never had occasion to consider whether a check can be the proper subject of a gift causa mortis, and the cases cited by the administrator dealing with bills of exchange, bonds, and passbooks are inapposite.[2] In each of those cases, some factual consideration led the Court to question, and eventually find absent, the required intent on the part of the decedent to make a gift *in presenti*, one of the necessary elements of a gift causa mortis. Here, the

---

[2] *See, Gardner v. Moore's Administrator*, 122 Va. 10, 94 S.E. 162 (1917); *Norris v. Barbour*, 188 Va. 723, 51 S.E.2d 334 (1949); and *King v. Merryman, supra*.

court has specifically found that the necessary intent was present. Still, no gifts causa mortis were made.

As was stated in *Johnson v. Colley*, an essential element of a gift causa mortis is that "possession of the property given must be delivered at the time of the gift to the donee, or to someone for him, and the gift must be accepted by the donee." 101 Va. at 416. Section 3–409(1) of the Uniform Commercial Code provides:

> A check or other draft does not of itself operate as an assignment of any funds in the hands of the drawee available for its payment, and the drawee is not liable on the instrument until he accepts it.

Va. Code § 8.3–409(1).

Thus, while three checks were delivered by Yee to Woo, no *money* was delivered. And since no *money* was delivered, no *money* can be claimed by Woo as a gift causa mortis.

Woo argues that the above provision of the Uniform Commercial Code is not controlling because that provision is intended only to protect banks. I disagree. As is pointed out in American Jurisprudence's treatment of the subject, the Uniform Commercial Code provision cited above is a basis for "[t]he general rule supported now by nearly all the cases on the subject . . . that the donor's check, prior to acceptance or payment by the bank, is not the subject of a valid gift either inter vivos or causa mortis." 38 Am. Jur. 2d, *Gifts*, § 65 (1968). *See also* 38 A.L.R.2d 594, 596 ("While there are a few cases to the contrary, and limitations have been recognized in some instances, the general rule appears to be that the donor's own check is not the subject of a valid gift, either inter vivos or causa mortis, prior to acceptance or payment by the bank.").

The reasons for the general rule are several. First, in accordance with the literal language of § 3–409(1) of the Uniform Commercial Code, no assignment of funds takes place until the check is paid, and assignment of the funds is necessary to delivery. Second, until the check is paid, the donor retains dominion and control over the funds; that is, he or she can issue a stop-payment order. Since a gift causa mortis requires the donor to relinquish all further dominion and control over the subject of the gift (*see, Quarles v. Fowlkes*, 147 Va. 493, 507, 137 S.E. 365 (1927), and *Brown v. Metz, supra*, 240 Va. at 131), a retention of the power to stop payment defeats the gift. Third, since a

check is nothing more than the drawer's command to his or her agent (the drawee) to pay money, such command ceases at the drawer's death. Thus, the check is revoked prior to payment, and the gift is not complete. *See* 38 Am. Jur. 2d, *supra*, at 877.[3]

Fourth, and somewhat related to the second reason, is the fact that until the check is paid, the donor may intentionally *or inadvertently* defeat the gift by any number of acts, such as by writing another check on the same account. Indeed, such an occurrence happened here. When Woo cashed the $1,900 check at Central Fidelity, an overdraft in the amount of $250.07 was created. Does this mean that Yee intended a gift of only $1,649.93; that is, $1,900 minus $250.07? Or did he intend that his estate make up the difference? Suppose there was only $1 in the account when the check was presented for payment. Suppose Yee gave out three checks each for $1,900; which one is the *real* gift causa mortis? As was stated in *Quarles v. Fowlkes, supra*:

> Gifts *causa mortis* are not favored in law. They are a fruitful source of litigation, often bitter, protracted and expensive. They lack all those formalities and safeguards which the law throws around wills and create a strong temptation to the commission of fraud and perjury. Lord Hardwick declared, more than a hundred years ago, that it was a pity the statute for the prevention of frauds and perjuries did not set aside all such gifts. Justinian was so justly apprehensive of fraud with respect to them that he required them to be made in the presence of five witnesses. If the law limited such gifts to articles of small value and required the gift to be executed in the presence of disinterested witnesses, they would be less objectionable. But if large estates, amounting to thousands of dollars, may be thus disposed of and the title of the donee supported mainly by his own testimony, and that of near relatives, the public feeling of security may well be startled.
>
> Unfortunately, the common law has not adopted any of these precautions. It does not require the gift to be executed in the presence of any stated number of witnesses, nor does it limit the amount of property that may be thus disposed of. *But it does require clear and unmistakable proof, not only of an*

---

[3] This is true even though the drawee bank is not liable for cashing a check of a deceased drawer under certain conditions. *See* UCC § 4–405 (Va. Code § 8.4–405).

*intention to give, but of an actual gift, perfected by as complete a delivery as the nature of the property will admit of. It not only requires the delivery to be actual and complete, such as deprives the donor of all further control and dominion, but it requires the donee to take and retain possession till the donor's death.* Although the delivery may have been at one time complete, yet this will not be sufficient, unless the possession be constantly maintained by the donee. If the donor again has possession, the gift becomes nugatory, and public policy requires these rules to be enforced with great stringency, otherwise the wholesome safeguards of our testamentary laws become useless. It is far better that occasionally a gift of this kind fail than that the rules of law be so relaxed as to encourage fraud and perjury.

147 Va. at 506–07 (*quoting Hatch v. Atkinson*, 56 Me. 324, 326–27, 96 Am. Dec. 464 (emphasis added)).

While this court is not concerned with any possible commission of fraud in this case and while adhering to the majority rule may seem harsh in light of Yee's obvious intent to make a gift, the dangers inherent in relaxing the rule require, as stated in *Quarles v. Fowlkes*, that the rule be stringently enforced.

Woo argues that the court should consider her testimony and that of others that under Chinese tradition, wills are not often made, and people often give property shortly before death instead of writing wills. One reason for this, according to Woo and her witnesses, is a belief that by writing a will, a person "courts death." This argument, however, even if accepted by the court, goes only to Yee's intent to make a gift, something the court has expressly found. It has nothing to do with delivery of the subject of the gift itself.

Finally, Woo argues that even if all the technical requirements of a gift causa mortis are not met, the court should use its equitable powers to declare a constructive or resulting trust in her favor. This should occur, according to Woo, because even if there was a technical failure of delivery, Yee's intent was so obvious, and his love for Woo so strong, that it would be unjust to allow Yee's relatives, with whom Yee had had so little contact and to whom there was probably lingering hostility, to inherit his money. While the court appreciates Woo's argument and sympathizes with her predicament, the argument must be rejected. Specifically, if Woo's argument in this regard were accepted,

this court would be eliminating one of the essential elements of a gift causa mortis, delivery. If, as Woo argues, intent to make a gift causa mortis can overcome lack of delivery simply by calling the gift a constructive or resulting trust, there is no point in talking about the essential elements of a gift causa mortis in the first place. Those elements, however, do exist, and intent *and* delivery are equally necessary. The presence of one cannot make up for the absence of the other. Both must exist, as well as the other elements required. Because the necessary element of delivery was not present here, no gift — whether called a gift causa mortis or anything else — occurred. Woo is not entitled to any part of the estate to satisfy the $80,000 check, and she must repay to the estate the $44,600 received when she cashed the other two checks.

## 2. Securities And Other Accounts

The court also finds that Woo is not entitled to any portion of the securities and other accounts which were listed only in Yee's name at his death. This decision is based not on any legal principles concerning constructive or resulting trusts or unjust enrichment as argued by Woo. Instead, it is based on the court's factual finding that Woo failed to carry her burden of proving what amounts she contributed to the subject securities and accounts and that those securities and accounts were intended to be joint property. Thus, while Woo testified about certain deposits she had made and introduced deposit slips to support her testimony, the court simply cannot say that she or Yee intended that all or any of those deposits remain her property. Indeed, it appears that Yee and Woo each had accounts in their own names and that each occasionally deposited money into the other's accounts. The court can no more say that deposits made by Woo into Yee's accounts belong to Woo any more than deposits made by Yee into Woo's accounts belonged to Yee. Once again, the warning expressed in *Quarles v. Fowlkes*, set out above, about the need to adhere to strict testamentary and gift laws applies with equal force here. Everyone knows, or is presumed to know, that money deposited in only one person's name belongs only to that one person, and that only a valid will can prevent that money from going to that person's next-of-kin upon his or her death. Such knowledge exists, or is presumed to exist, regardless of any alleged traditions or superstitions of a particular culture. Here, Ms. Woo, who is a college graduate, chose to put her money into an ac-

count in which she had no ownership. While the court sympathizes with her predicament, it cannot, even in equity, amend Virginia's testamentary laws. Woo cannot recover any money from the estate.