# 𝔖taunton

## FIRST NATIONAL EXCHANGE BANK OF ROANOKE AND R. H. THOMAS, EXECUTORS OF PAUL MASSIE v. ROANOKE OIL COMPANY, INCORPORATED.

September 23, 1937.

Present, Campbell, C. J., and Holt, Hudgins, Gregory, Eggleston and Spratley, JJ.

The opinion states the case.

*Cocke, Hazlegrove & Shackelford,* for the appellants.

*Hall, Buford & Carter,* for the appellee.

SPRATLEY, J., delivered the opinion of the court.

This is a suit for the specific performance of a contract to sell land. The case is so largely dependent upon the facts and the construction to be put on them, that it is necessary to set out the evidence in considerable detail.

The First National Exchange Bank of Roanoke, Virginia, and R. H. Thomas, hereinafter referred to as executors, are the duly qualified executors of the estate of Paul Massie, who owned, at the time of his death, several parcels of real estate in the city of Roanoke. The Roanoke Oil Company, Incorporated, hereinafter referred to as the oil company, desiring to establish a gasoline station for filling service purposes, entered into negotiations with the executors and obtained a lease of a parcel of that estate.

The lease was dated November 1, 1935, but was not acknowledged until January 11, 1936. This delay is explained by the fact that it was desired to secure the signatures of various beneficiaries of the estate, located at distant points.

The land is described in the lease by metes and bounds, and also as "being the westerly portion of the property of Paul Massie's estate, located on the north side of Salem Avenue," fronting one hundred and fifteen feet thereon.

The lease is for a term of ten years, beginning November 1, 1935, at a rental of fifty dollars per month. Among numerous covenants and provisions, it contained the following clause:

"Eighth: If, during the term of this lease, the Lessors receive a *bona fide* offer of sale of the said premises, free and discharged of this lease, and desire to sell the said premises upon the price and terms of said offer, then the Lessors

shall have the right to terminate this lease, provided that they give to the Lessee an opportunity to purchase the said property at the price and upon the terms of the said offer. If the Lessors receive such an offer, which they are willing to accept, they shall notify the Lessee in writing of the said offer and of their willingness to sell the said property upon the price and terms thereof, and the Lessee shall have a period of five days from the receipt of such notice within which to purchase the said property at the price and terms of said offer, and if the Lessee shall fail to notify the Lessors within five days after receipt of such notice of its desire to purchase said property at such price and terms, then this lease shall forthwith terminate, except that the Lessee shall be entitled to retain possession of the said premises for a period not exceeding ninety days, from the time when the Lessors shall notify the Lessee of the said offer, for the purpose of removing therefrom any buildings, fixtures and equipment erected or installed thereon and of replacing the said premises, to their now present state and condition, and the Lessee shall continue to pay the stipulated rent for said premises during such period it may so retain possession thereof."

At the time of the execution of the lease, the Massie estate owned, and still owns, in addition to the property described in the lease, an adjoining parcel on the east, upon which there is a building leased to and occupied by the Roanoke Steam Laundry.

The oil company, immediately after taking possession of the property covered in its lease, constructed and equipped a gasoline filling station at a cost of approximately $3,500.

Mr. Paul Stonesifer, the trust officer of the First National Exchange Bank, handled the negotiations on behalf of the executors for the lease, while Mr. H. F. Stoke, vice-president of the oil company, represented the latter. The directors of the oil company, in addition to Mr. Stoke, comprising all of the stockholders and officers of the company, are J. D. Wells, president, John A. Lucas, vice-president, and Ira F. Walton, secretary-treasurer.

Stonesifer met Walton on the afternoon of July 6, 1936, and briefly told him that the executors had received an offer from a Mr. Jones, the owner of the Roanoke Steam Laundry, for the purchase of the two adjoining parcels of land on Salem avenue, owned by the Massie estate, one occupied by the steam laundry and the other by the oil company, and that he was writing the latter a letter relative thereto, which his company would receive the next day. Walton says he then asked Stonesifer, "I wonder if by any chance there could be a splitting up of that property, and we buy the portion of it that we are now occupying and Mr. Jones buy a portion of it?" Mr. Stonesifer replied, "No, as far as we are concerned, we cannot do that, it belongs to the estate, and we will have to sell it as a whole, and we cannot split it up." On the same afternoon after receipt of the above information, the directors of the oil company held a meeting, and decided to call on Jones, to find out whether he would continue their lease, and his attitude towards the lease. They were unable to make any satisfactory arrangements with Jones.

The following letter, omitting the formal parts thereof, dated July 6th, signed by Stonesifer, was received by the oil company on July 7th:

"As Co-Executor of the Estate of Paul Massie, Deceased, we have received an offer of $20,000 cash for the property standing in Paul Massie's name, which is occupied by the Roanoke Steam Laundry and yourselves.

"Clause Eight of lease dated November 1, 1935, between the Executors of the Estate of Paul Massie and yourselves provides that the lessor shall have the right to terminate the said lease provided they give the lessee an opportunity to purchase the said property at the price and upon the same terms of said offer. The lessors are willing to accept the above-mentioned offer and we hereby notify you thereof.

"In the event you fail to notify us within five (5) days, this lease shall forthwith terminate and you shall be entitled to retain possession for a period not longer than ninety (90) days.

"Will you please give us a reply to this letter within the five-day period?"

On July 7th, after receipt of this letter, John A. Lucas, vice-president of the oil company, went to the bank, and had a conference with J. T. Meadows, the president of the bank. Mr. Meadows informed him that he did not know of the Jones offer, did not know of the option contained in the lease, and did not know that the letter of July 6th had been written. He said he was informed by Meadows that the oil company could exercise its right under the lease and under the letter, to buy the property at that price, but the only offer they had to make was one for the entire property.

After the meeting of the directors of the oil company on July 7th, each of the directors made separate efforts to secure financial aid to purchase the property, and agreed to meet to report the result of these efforts on July 8th, at twelve o'clock.

In response to a telephone message on the morning of July 8th, Walton and Lucas drove to the bank, and had a conference with Meadows and Stonesifer, lasting from forty minutes to an hour. Both Walton and Lucas testified that they made it clear at this conference, that while the oil company preferred to make some arrangement to continue its lease, and not to buy any of the property, it would, if necessary to protect its investment, raise the necessary amount to purchase the whole property; but that they would have to report to their board of directors any suggestion made before their company could be committed. Either at their suggestion, or at the suggestion of the officers of the bank, the latter agreed to see Jones, and ascertain whether, and, if so, in what way he would split his offer for the property, so that the oil company might be in a position to buy only the leased premises; and if successful, such a proposition would be later submitted to the oil company. That the officers of the bank repeatedly told them that they could not do anything except sell the whole property; that they did not have but one proposition to offer and this was in the letter of July 6th; and that they had to raise $20,000, or

get off. Walton and Lucas further testified that no definite agreement was reached at this conference, and there was nothing to report back to a meeting of the oil company directors; that there was no notice of cancellation of the offer; and that the letter of July 6th was not withdrawn, or anything said indicating that it was written by mistake. Lucas also testified that he remembered distinctly that either Meadows, or Stonesifer stated that "Jones would not be satisfied with a portion of the property because he already owned another location and would either have to acquire this entire property or move."

Stonesifer, in his testimony, in referring to these conferences, did not say that the letter of July 6th was written by mistake. He would only say that this letter was for the purpose of making the oil company cognizant of the terms of the lease, and of the receipt of an offer the executors had received for the entire property.

Meadows did not recall the language used by Walton and Lucas, but got the impression from them that being anxious to protect their lease, they were concerned with the suggested cancellation of same. He testified that neither of them said anything to indicate that they understood they had received a definite offer to buy the entire property. He said they were told that the first letter was merely to notify them of the offer, and to give to them an opportunity to negotiate for the purchase of that part of the property occupied by them.

The officers of the oil company, after ascertaining from the executors that they could immediately execute a deed for the property, without securing the signatures of the absent beneficiaries, on July 8th, reached an understanding with a man named Johnson, whereby the latter would put up $20,000 for the purchase of the property. Johnson agreed to lease the filling station lot to the oil company for ten years at the same rental, with no right of cancellation reserved in the lease, and, in addition, gave to it the right to purchase the lot at any time during the ten-year period at the price

of $12,000, if purchased during the first year; but the price was to increase $600 each year thereafter.

Johnson desiring to consult his attorney, went with Stoke, on July 8th, to the office of Mr. Hazlegrove, who, as it happens, is a member of a law firm, which also represents the First National Exchange Bank in many matters. Mr. Hazlegrove knew nothing of this particular transaction with the executors, or the bank, but expressed an opinion to them that the letter of July 6th, was not intended as an offer to sell the whole property to the oil company. Stoke took the position that the oil company was obligated, under the circumstances and by its lease, to buy the whole property, or to vacate. The latter, referring to the original negotiations for the lease, said that it was his understanding, both at the time the lease was made and at the present time, that the option clause required them to purchase the entire property, or to vacate, if an acceptable offer was made by another and accepted. There is no testimony in the record that Mr. Hazlegrove was representing the executors at the time that he was consulted by Mr. Johnson, as his attorney.

Now, in the meantime, Wells had arranged to secure from another source a loan of $12,000 on the property, which with $8,000 the oil company could put up, would finance the proposition.

The directors of the oil company met on July 8th, and received the reports of its officers to secure a loan to finance the purchase of the whole property. Between one and two o'clock of that day, they decided to buy the property, and to give notice to that effect at once. In accordance therewith, the following letter of July 9th was written, and delivered on the morning of that day to the officers of the First National Exchange Bank, representing the executors:

"The Roanoke Oil Company, hereby accepts the proposal contained in your letter of July 6, 1936, to purchase the property described therein, located in Roanoke, Virginia, and abutting on Salem Avenue, Park Street, and Norfolk Avenue, and now occupied by the Roanoke Steam Laundry

and the Roanoke Oil Company, Incorporated, at the quoted price of $20,000 cash.

"It is understood that the title to said property shall be found satisfactory to the Roanoke Oil Company, Incorporated, and free and clear of all encumbrances."

Each of the officers of the oil company testified that their actions were in good faith.

After receipt of the letter of July 9th, Mr. Stonesifer had Mr. Jones come to the bank, after three o'clock in the afternoon, and discussed a split offer for the property with the latter. Jones then made an offer to take the laundry property at $8,500, and the filling station property at $11,500. The record does not disclose whether Mr. Jones was advised of the previous negotiations, of the position taken by the oil company, or why the oil company was not called into this conference.

On this latter day, Stonesifer recalls, that after six o'clock p. m., the following letter was put in the post office, written by the executors, and addressed to the oil company.

"We are in receipt of your letter of July 9th.

"Our letter to you of July 6th was not an offer to sell to you the properties mentioned in your letter of July 9th, but was intended merely to comply with the terms of paragraph eight (8) of your lease on a part of the property, which lease was specifically referred to in our letter. We so advised your Messrs. Walton and Lucas on their visit to this bank on yesterday, July 8th, and specifically told them that there was no outstanding offer to you to sell the properties.

"This is to advise you, therefore, that we do not consider your letter as an acceptance of any offer or as creating any obligation between you and the Estate of Paul Massie with reference to these properties.

"Since our letter to you of July 6th, the offer on which that letter was based has been withdrawn. We now have a *bona fide* offer of $11,500 cash for the property covered by your lease, which we are willing to accept.

"We are writing to advise you of this offer in order that you may, if you so desire, exercise your rights with respect thereto as provided for in your lease."

The above letter was received by the oil company on July 10th, and it appears to have been the first word that it had received from the executors, or from the bank officers, since the conference on July 8th.

The oil company then employed counsel, and upon advice of counsel, wrote its concluding letter of July 14th, to the First National Exchange Bank, as follows:

"Your letter of July 9, 1936, was duly received on July 10, 1936.

"This Company respectfully denies that its Messrs. Walton and Lucas were given the advice stated in the second paragraph of your letter, and this Company dissents from the position taken by you in the third paragraph of your letter.

"Your letter to this Company of July 6th, and its letter to you of July 9th, constitute a definite, clear contract for the purchase from you by this Company of the property described in the letters. In the absence of an expression of intention from you to perform your obligation under the said contract promptly, this Company, while regretting the necessity of litigation, will take such steps as it has been advised are proper to enforce its rights.

"Without waiving its rights under the said contract, but expressly reserving and insisting upon the same, this Company, in order to protect its rights under the lease referred to in your letter of July 9th, hereby notifies you of its desire to purchase the property covered by said lease at the price and terms of the offer set forth in said letter; that is, $11,500 cash. This Company hereby accepts the said offer."

The executors, upon receipt of the above letter, on July 15th, replied thereto, recognizing the right of the oil company to purchase the leased property at $11,500 cash; but repeated their former position that the letter of July 6th, was not intended to be an offer for the sale of the entire property.

The evidence of Stoke that it was understood in the negotiations for the lease, that the option of purchase contained in clause eight referred to the whole of the Massie property, fronting on Salem avenue, and was not confined solely to the premises leased to the oil company, and that it was at his suggestion that this clause was inserted in the lease, which was prepared by the attorney for the executors, was not contradicted.

Neither Johnson nor Jones were made parties to this suit. Neither Johnson, Jones, nor Hazlegrove testified.

The evidence shows that the gasoline filling station was valuable largely because it was close to a trucking depot and warehouse company owned and operated by Johnson. If the property occupied by the steam laundry, could be secured by the oil company for Johnson, to be used in connection with the latter's business, such use would bring a large prospective oil and gasoline business to the oil company. There was no contention that the estate of Massie would suffer by the sale of the entire property for $20,000, either as a whole, or in parcels.

Being unable to reach a satisfactory solution of the above controversy, the oil company, on July 16, 1936, instituted a suit against the executors for specific performance of the contract. The bill alleged a written contract between the parties, consisting of the lease, the written offer of July 6th, and the written acceptance of July 9th, for the sale of the two parcels of property; the refusal of the executors to comply with their contract; the readiness, willingness and ability of the oil company to comply therewith, or, if that were denied by the court, to purchase the property described in the lease for $11,500; and actual and substantial damage to the oil company, if the contract were not performed. The prayer was for specific performance of the contract for the sale of the two parcels, or of the leased premises alone, if the former should be denied by the court, and for an injunction restraining the executors from disposing of any of the property in the meantime. A temporary injunction was granted, and continued until the final decree.

The executors filed an answer on September 15, 1936. In this answer, they denied that they had ever made an offer, either in the letter of July 6th, or at any other time, to sell to the oil company the whole property of the Massie estate on Salem avenue. They averred that the letter of July 6th was simply a notice of an offer received by the executors; that the option in the lease was confined merely to the leased premises; that the oil company had advised the executors that they did not desire to purchase the whole property; and that the executors were willing to convey to the oil company the leased premises for the amount of the separate offer obtained, in full satisfaction of all its demands.

All testimony was taken *ore tenus*. On December 9, 1936, the trial court entered a decree directing specific performance of the contract for the sale and conveyance of the entire property on Salem avenue.

The trial judge, in his written opinion, held that a fair and reasonable interpretation of the lease gave the oil company, in the protection of its investment of the leased property, the right to exercise the option under clause eight, to purchase the entire property on the terms and conditions of an acceptable offer received by the executors. He held that the above clause created a binding contract, requiring the submission of any acceptable offer, affecting the leased premises, to the oil company, which, if not exercised under the terms of the option, would terminate the lease; that in the light of the language in the provisions of the lease itself, and from the facts and circumstances described in the record, relating to the construction that the signatory parties themselves placed upon the lease, the plain import of the letter of July 6th, was a transmission of the offer to purchase, which the oil company had the right to accept, or reject; and that the acts and negotiations of the representatives of the parties, subsequent to the receipt of the letter, and prior to the letter of acceptance, show the offer to have been accepted before any attempt of withdrawal.

The executors, in excepting to the action of the trial court, specifically assign the following grounds of error:

(1) That the executors were not required, under the lease to submit offers acceptable to them affecting the leased premises, when such offers included other property, because, under the lease, the oil company had only an option on the leased property; (2) the letter of July 6th did not constitute an offer to sell both parcels, and if it did constitute such an offer, it was withdrawn, revoked and rejected before acceptance; (3) that no contract was created for the sale of both parcels; and (4) that the facts do not warrant the remedy of specific performance.

■ The record discloses that the manifest intention and import of clause eight of the lease was inserted for the protection of the lessee and its investment in the filling station. A sale of the property occupied by the oil company, free of the lease thereon, separately, or with other property, would seem in either event, under the language of the lease, to constitute "a sale of the said premises." It is clear that if the leased premises could be sold together with other property, discharged of the lease, without an opportunity being given to the lessee to purchase the whole property sold, or, at least, that portion occupied by it, the intention and purpose of the option would be completely destroyed. Certainly, any sale of the leased premises, free of the lease, affected both the premises and the lease.

■ The letter of July 6th was written by a capable and intelligent trust officer, and one who had participated in the original negotiations for the lease. Nothing was said in the letter concerning any further negotiations, either for a sale of the two parcels of the property, or a part thereof, or anything concerning the specific purchase price of a part. Nor did Stonesifer give any satisfactory explanation why the letter, written by him, containing a notice of the contingent termination of the lease, under the terms thereof, failed to make any such reference, or why the offer contained in the letter was not withdrawn before July 9th, if the executors deemed it ineffective. This letter specifically referred to the eighth clause of the lease, and Stonesifer refused to say other than that it was written under the terms of the lease.

Its language, and the subsequent words and actions of the executors prior to July 9th, indicated their desire and purpose to sell, as a whole, the two parcels of property, and to terminate the lease. Both the letter and their actions evidence their interpretation of the option clause, and make it unmistakable that the letter was transmitted thereunder.

It was not until suit was brought that the executors contended that it was only when they submitted a separate offer for the leased premises alone, that the oil company was obligated to make a decision. This is in conflict with their notification of a termination of the lease, in the event of a sale of the entire property consisting of the two parcels to another. The first position of the executors is significant, and we think corroborates the above conclusion that they understood the option clause related to any sale of the leased premises, separately or together with other property.

A consideration of all of the evidence makes it fairly clear that what the letter of July 6th said, in effect, was: "We have received an acceptable offer of $20,000 for the two parcels of land, occupied by the Roanoke Steam Laundry and the Roanoke Oil Company, Inc. Under our lease with you, you have the right to purchase these two parcels upon the price and terms of that offer within five days. If you fail to comply with those terms within that period, then under the provisions of your lease, you must submit to a termination thereof."

Under the threat of a cancellation of this lease, the oil company was placed in the position, that if it desired to protect its investment, and to continue in possession of the premises occupied by it, it must either meet the terms of the Jones offer, or arrange with the proposed purchaser of the whole property to buy a part thereof. This proposition it met by an acceptance of the terms of the Jones offer.

We must look to the outward expression of a person as manifesting his intention rather than to his secret and unexpressed intention. "The law imputes to a person an intention corresponding to the reasonable meaning of his words and acts." 13 C. J. 265.

■ Nor do we think, under the circumstances of this case, that the offer of July 6th was withdrawn or rejected while negotiations were pending. The oil company never took the position that it could not be required to buy the entire property, or that the notice was not in accordance with the provisons of the lease. It did not say that it would or would not, could or could not, purchase on the terms offered. It did not ask any counter-proposal of the executors, but, before accepting the offer of the entire property, requested them to secure another proposal from Jones, which would permit of an alternative offer. The original offer was kept open, while waiting for the alternative proposal, and while urgent efforts were being made by the oil company to meet the original terms offered. Before the alternative proposal was received from Jones, and within the five-day period, covered in the lease, acceptance was made of the original offer. In the acceptance of July 9th, no condition was affixed, or any modification, or change made, or requested. Acceptance was made in accordance with the terms of the offer.

■ The practical construction put by the parties upon the terms of their own contract is not only to be regarded, but, where there is any doubt, must prevail over the literal meaning of the contract. *Knopf* v. *R., F. & P. R. Co.*, 85 Va. 769, 8 S. E. 787.

"No rule for the construction of written instruments is better settled than that which attaches great weight to the construction of the instrument by the parties themselves. * * * " *Holland* v. *Vaughan*, 120 Va. 324, 91 S. E. 122, 124; *Chick* v. *MacBain*, 157 Va. 60, 160 S. E. 214; 6 R. C. L. 853.

"The dealings of the parties to a contract in relation to its terms are often conclusive upon questions arising as to its effect or meaning. This may be because the parties have deliberately and mutually disregarded its plain terms, or it may be because they have so dealt with each other as to definitely fix the meaning of the terms which would otherwise be of doubtful import. In the former case, their plain rights have been waived * * *. In the latter case the doubt-

ful rights of the parties have been fixed by their practical dealings with each other." *Robin* v. *Sydeman Bros.*, 158 Va. 289, 163 S. E. 103, 106; *Standard Ice Co.* v. *Lynchburg Diamond Ice Factory*, 129 Va. 521, 106 S. E. 390, 393.

In consideration of the evidence, we have borne in mind the opportunity of the trial judge to see, and to hear each of the witnesses testify. All of the facts and circumstances surrounding the negotiations and conferences between the parties, were presented to him in a more vivid picture than a printed record can show. His conclusions on questions of fact are entitled to peculiar weight and consideration, and we must accept them just as we must accept a jury's verdict, sustained by evidence which it might have believed. *Planter's National Bank* v. *E. G. Heflin Co.*, 166 Va. 166, 184 S. E. 216; *Howren* v. *Howren*, 164 Va. 141, 178 S. E. 678, 679; *Hartman* v. *Melfa Banking Co.*, 162 Va. 433, 436, 174 S. E. 653; *Amos* v. *Franklin*, 159 Va. 19, 22, 165 S. E. 510; *Williamson* v. *Johnson*, 164 Va. 632, 637, 180 S. E. 310, 312; *Quarles* v. *Fowlkes*, 147 Va. 493, 137 S. E. 365; and Virginia Code 1936, section 6363.

The interpretation of the contract by the trial court, under the evidence and circumstances in this case, is fair and reasonable. Out of the conflict of the evidence, there is sufficient to support that interpretation, which also seems to be in harmony with the original understanding of the parties as expressed by their own actions.

Text books and decisions, too numerous to mention here abound with expressions of the equitable principles embodied in specific performance. The difficulty lies in the application of the principles to specific instances or contracts.

It is settled by a long course of decisions as a principle of equitable jurisprudence, that specific performance of a contract is not a matter of absolute or arbitrary right, but is addressed to the reasonable and sound judicial discretion of the court. There are general rules and principles, which govern its application, but relief is granted, or refused, according to the circumstances of each particular case. Therefore, no positive rule fitting all cases, can be

laid down. In general, it will be used to promote an exact measure of justice, as nearly as is possible, and will be refused when it will produce injustice. It is never granted unless it is entirely in accordance with equity and good conscience. When the contract sought to be enforced, has been proven by competent and satisfactory evidence, and there is nothing to indicate that its enforcement would be inequitable to a defendant, but will work injury and damage to the other party if it should be refused, in the absence of fraud, misapprehension, or mistake, relief will be granted by specific enforcement. *Millman* v. *Swan*, 141 Va. 312, 127 S. E. 166; 8 Michie Digest, Va. and W. Va. 1003; 58 C. J. 855.

Here the executors made a definite offer as to price, terms, and subject matter. This offer, as we have seen, was accepted without modification or change. There is no evidence that the letter of July 6th, or any word therein, was written by mistake. Both parties, certainly, until the acceptance letter of July 9th, construed and treated the option clause as requiring notice of an acceptable offer for the entire property to be given to the lessee. The record shows no legal obligation on the part of the executors to Jones, nor any hardship to be inflicted on the latter. The Massie estate will receive $20,000 for the entire property, whether it be sold as a whole, or in parcels. There is nothing to render the performance of the contract inequitable against the estate of Massie. It is apparent, on the other hand, that the enforcement of the contract will be of considerable benefit to the oil company, and that it will suffer substantial damage should specific performance be refused. The contract is unobjectionable in its nature and in the circumstances connected with it. The remedy in equity is more beneficial than the remedy in law, since it would be difficult to establish the entire damages before a jury. All of the equities favor the oil company.

For the foregoing reasons, we are of opinion that there is no error in the decree complained of, and it is affirmed.

*Affirmed.*