# Richmond

THE CHESAPEAKE AND OHIO RAILWAY COMPANY V.
W. W. DOUTHAT.

October 14, 1940.

Record No. 2260.

Present, All the Justices.

The opinion states the case.

*J. M. Perry,* for the appellant.

*·Harry L. Snead* and *J. Russell Early,* for the appellee.

CAMPBELL, C. J., delivered the opinion of the court.

This suit is brought by appellant, The Chesapeake and Ohio Railway Company, for specific performance of an alleged contract in writing, entered into between appellant and W. W. Douthat, appellee.

The bill of complaint avers that the contract sought to be enforced was as follows:

"THIS AGREEMENT, made this 7th day of November, 1936, between W. W. Douthat and Ora H. Douthat, his wife, parties of the first part, and THE CHESAPEAKE AND OHIO RAILWAY COMPANY, a corporation, party of the second part.

"WITNESSETH: That for and in consideration of One ($1.00) Dollar cash in hand paid, and other valuable considerations, the part— of the first part agree— to convey to the party of the second part all of his right, title, and interest in and to certain property situate and being in the Co. of Botetourt, State of Virginia, and described as follows:

"That certain tract of land containing 10½ acres, known as the old Stone Quarry at Price's Bluff, and reserved in the deed from W. W. Douthat and wife to ———— Obenchain by deed dated ————, recorded in Deed Book ————, Page ————, Botetourt County records.

"And the party of the second part agrees, on the conveyance to it, of the property hereinbefore described, to pay to W. W. Douthat, party of the first part, the sum of Two Hundred Dollars ($200.00) in full for the purchase price of same.

"And it is further agreed between the parties hereto, that the said The Chesapeake and Ohio Railway Company, a corporation, is to have the right to enter upon the said property hereinbefore described and take possession of the same and to prosecute its work thereon without interference from the part— of the first part, pending the examination of the title to the same and the tendering to it of a deed conveying all his right, title and interest.

"WITNESS the following signatures and seals:

"W. W. DOUTHAT (Seal)

"THE CHESAPEAKE & OHIO RAILWAY COMPANY,

"By W. L. Harrison."

The bill further avers that appellant tendered to appellee the agreed purchase price, which he refused to accept, and also refused to execute the conveyance stipulated by the agreement.

Appellee answered the bill of complaint and admitted the signing of the agreement, but alleged in the answer that the agreement was procured by the misrepresentations of appellant's agent in regard to the value of the land, the purpose for which it was to be used and the amount of delinquent taxes then due upon the land; that at the time of signing the agreement he was under the belief that the contract would require the signature of his wife; that, when interviewed by appellant's agent, his wife refused to sign the agreement, on the ground that the property was worth more than the price stated, and that the agent thereupon offered to pay the sum of $500 for the property, which offer was declined; that thereupon, the interview closed, with the understanding that further negotiations would be resumed in the future.

Appellee also filed, over the objection of appellant, his cross-bill or supplemental answer, seeking an ascertainment of the amount due appellee for stone removed from the land by appellant.

Upon a hearing of the cause upon the bill, answer, supplemental answer and the depositions of witnesses, the court, being of opinion that the parties had not reached a final agreement as to the sale of the property refused to decree a specific performance of the alleged agreement of sale, overruled the demurrer of appellant to the cross-bill, and upon consideration of the cross-bill and answer thereto, decreed that the cause be referred to a master commissioner, to ascertain and report what amount, if any, is owing to appellee for the stone removed by appellant from the premises. From that decree this appeal was allowed.

The admitted facts may be thus summarized: In the year 1907, appellee was the owner of a tract of land situated in Botetourt county upon which was located a stone quarry. During the operation of this quarry by appellee, the stone taken therefrom was sold to appellant as ballast. Sometime in 1907, appellee sold to one Thomas the arable portion of the farm, reserving the quarry (approximately ten acres), and then moved from the county. From 1907 until 1936 appellee failed to pay the taxes assessed against the land reserved, and it was therefore, returned delinquent. In the year 1936, appellant contemplated riprapping its railroad embankments situated between Glen Wilton, Virginia, and Buchanan, Virginia, to protect them against recurring floods in James River, and in order to obtain the material for that purpose, was desirous of obtaining the land here involved.

From the time the agent of appellant interviewed appellee with reference to a purchase of the quarry until the institution of this suit, the evidence is in hopeless conflict.

The case made by appellee, upon which the lower court based its decree, is as follows: on November 7, 1936, appellee was employed as a clerk in a grocery store in the city of Petersburg. While so employed, he was approached by an

agent of appellant who stated that he wished to buy the old quarry for appellant to use as a "dump pit"; that the property had no value, but that the Company would pay him two hundred dollars for it; that he told the agent he had lost title to the property by reason of his failure to pay taxes on it, which he thought amounted to two or three hundred dollars; that the agent said he would pay all taxes against the property; that he signed the agreement under the belief that it was necessary for his wife also to sign the agreement; that he 'phoned his wife the agent was coming to see her and for her and Mr. Early (his son-in-law, who is a lawyer) to look over the agreement, and, if they thought it was all right, to sign it. When the agent of appellant arrived at the Douthat home, he found Mrs. Douthat and Early awaiting him. Mrs. Douthat's account of the interview is as follows:

"Q. Mrs. Douthat, please state what Mr. Harrison said to you and what you said to him, and state what took place?

"A. He introduced himself as being in the Real Estate Department of the C. & O. Railway Company, and said that he had just been to Mr. Douthat's store and he had signed a contract agreeing to sell Price's Bluff and that he had come down to get my signature. I told him that had been a very valuable possession to us and that we had done business with the C. & O. Railway, but we had had many reverses and in recent years we hadn't even been able to keep up the taxes on the place, and that I was glad that the C. & O. Railway Company had need of the Bluff, but it seemed to me that $200.00 was a ridiculous price to offer for it, that I thought the least they would offer would be $500.00.

"Q. What was his reply to that suggestion?

"A. He said unhesitatingly we will give you $500.00 and offered me the contract for me to sign. I said 'No, Mr. Harrison, I won't sign it for $500.00.' My son-in-law is a lawyer and he attends to Mr. Douthat's business and mine and I would like for him to look into this matter. We want

to do business with your Company, but we would like to know more about it. Mr. Early will be glad to talk to you.

"Q. Did Mr. Early and you then talk to Mr. Harrison about the matter?

"A. Yes, sir.

"Q. Do you recall now his conversation as to the purposes for which the Bluff was to be used and the price or value of it?

"A. He told me that it was of no value; that there were quarries all along the C. & O. Railway that people were glad to give away.

"Q. Did he tell you what they purposed to do with this quarry?

"A. No. He did not. Mr. Douthat had told me. Mr. Douthat told me he wanted it for a dump pit.

"Q. Was the question of taxes discussed?

"A. Yes, sir.

"Q. What was said?

"A. Mr. Harrison stated that in talking with Mr. Douthat that he had told him that he didn't know whether he really owned the quarry, that he had been unable to pay the taxes for a number of years and he said 'I understand it is assessed as mineral property and the taxes will be high,' but Mr. Harrison said 'The C. & O. will take care of the taxes, if you all will just sign this contract. You won't have any trouble about the taxes.'

"Q. Did he offer to pay the $500.00 and pay the taxes too to you?

"A. Well, that was my understanding, for he plainly said 'You will have $500.00 and I wouldn't have $500.00 if I had to pay the taxes out of it.

"Q. Did he give you the contract in your hand to read or sign?

"A. No, but he arose with the contract to offer to me and I said 'No, I won't sign for $500.00' because I would like to know more about the matter and my son-in-law is a lawyer and attends to our business. I remained in the room until he left.

"Q. When he left, do you remember any statements he made with reference to what they would do from that point on regarding the fact whether he agreed to purchase this property?

"A. I remember him telling Mr. Early that he wished he would attend to the matter promptly, that if he did not that it would not be of any interest to the C. & O. Railway Company and he also gave Mr. Early the name of the gentleman to whom he was to write.

"Q. When he left there, what impression did he leave with you as to any contractual relationship with Mr. Douthat?

"A. Well, my impression was that the contract was void because he told Mr. Early to attend to the matter right away and he left in a very amiable frame of mind."

J. R. Early deposed as follows:

"Q. Were you there on the occasion when Mr. Harrison, a representative of the C. & O. Railway, came to see Mrs. Douthat with reference to the signing of the contract which had just previously been signed by Mr. Douthat?

"A. Yes, sir. I was present during the entire conversation and can substantiate practically all of Mrs. Douthat's testimony as to the conversation that took place between Mr. Harrison and herself, and I have been present during the taking of her deposition.

"Q. Will you now in your own way state just what took place?

"A. Well after Mr. Harrison discussed with Mrs. Douthat, my mother-in-law, the proposition in regard to the property she suggested to him that I was a lawyer and that I would handle or look after the matter. In view of the statement about the taxes, I suggested to Mr. Harrison to let me ascertain the amount of taxes that was due on the property and also told him that we would be interested in doing business with them on a yardage or tonnage basis and I did not think that we would be willing to sacrifice the property for the sum of $200.00. That was on Saturday, November 7, 1936, around 3:30 approximately. I told Mr. Harrison

that I would investigate about the tax matter; so on Sunday night I left here for Fincastle.

"Q. What did Mr. Harrison say with reference to your delay or method in handling this matter?

"A. Mr. Harrison said that whatever was going to be done would have to be done immediately that if we were not interested in doing business with them that they would go elsewhere, and that is the impression I got when Mr. Harrison left home because he gave me the name of Mr. George D. Moffett, who was the General Real Estate agent at that time and advised or suggested that I take the matter up with him immediately which I did.

"Q. The matter of whether you would sell the property?

"A. Negotiate further with Mr. Moffett in regard to the property, but it seemed that time was the essence of the whole thing that if we do not do something immediately he would not be interested.

"Q. Did he leave you under the definite impression that there was no contractual relationship existing?

"A. The impression that we all seem to have after he left was as though there had been no contract signed by either one of the parties. Nothing further was said about any action or anything was to be done about the contract."

This witness also stated that due to the remedial Act of 1934, the enactment of section 282a of the Tax Code, Code 1936, Appendix, p. 2494, that the taxes then due upon the quarry property amounted to the sum of $11.12; that pursuant to his impression that the negotiations were at an end, he wrote Moffett in regard to a lease of the property; on a yardage basis, this offer was declined.

It is further shown by the record and relied upon by appellee in support of his contention that the contract was never consummated, that the original agreement contained the names of W. W. Douthat and Ora H. Douthat; that Ora H. Douthat did not sign the agreement; that Harrison, the agent, offered to increase the purchase price to $500; that he referred Early to Moffett for further negotiation; that the blue prints prepared by the engineers of appellant, after

the date of the alleged agreement, bore this notation: "Property to be acquired from Douthat"; that the deed prepared by the agent of appellant to effectuate the agreement of sale relied upon, specifically sets forth the parties of the first part as Warner W. Douthat and Ora H. Douthat, his wife, thus evincing the fact that appellant deemed Mrs. Douthat a necessary party to the original agreement.

 The rule of law in regard to the specific enforcement of a contract of sale of property has been repeatedly stated by this court. In the recent case of *First National Exchange Bank* v. *Roanoke Oil Company*, 169 Va. 99, 192 S. E. 764, 771, Mr. Justice Spratley said:

"It is settled by a long course of decisions as a principle of equitable jurisprudence, that specific performance of a contract is not a matter of absolute or arbitrary right, but is addressed to the reasonable and sound judicial discretion of the court. There are general rules and principles, which govern its application, but relief is granted or refused, according to the circumstances of each particular case. Therefore, no positive rule fitting all cases, can be laid down. In general, it will be used to promote an exact measure of justice, as nearly as is possible, and will be refused when it will produce injustice. It is never granted unless it is entirely in accordance with equity and good conscience. When the contract sought to be enforced, has been proven by competent and satisfactory evidence, and there is nothing to indicate that its enforcement would be inequitable to a defendant, but will work injury and damage to the other party if it should be refused, in the absence of fraud, misapprehension, or mistake, relief will be granted by specific enforcement. *Millman* v. *Swan*, 141 Va. 312, 127 S. E. 166; 8 Michie Digest, Va. and W. Va. 1003; 58 C. J. 855."

 In the exercise of its discretion, based upon the material facts as detailed, we are of opinion that the trial court was correct in refusing to decree a specific performance of the contract sued upon on the ground that the contract was never consummated.

It is further assigned as error that the court erred in directing its commissioner to ascertain the amount, if any, due appellee by reason of the removal of stone from the quarry by appellant.

■ The assignment of error is well founded. If appellant is indebted to appellee, the amount of such indebtedness should be ascertained by a trial before a jury in a court of law, and therefore, under the provisions of section 6084 of the Code, the case should be transferred to the law court for trial on the merits.

■ Appellee substantially prevailing, the costs accruing in this court will be awarded against appellant.

For the reasons stated, the decree will be affirmed in part and reversed in part and the cause remanded to the trial court.

*Affirmed in part and reversed in part.*

HOLT, HUDGINS and EGGLESTON, JJ., dissenting.