# CIRCUIT COURT OF THE CITY OF ROANOKE

George E. Pannell

v.

Francis R. Banks
and Mohammed Albosaber

Case No. CL08000748-00

Mohammed Albosaber

v.

George E. Pannell,
Francis R. Banks,
and Ahmad S. Ibrahim

Case No. CL08000777-00

December 3, 2009

BY JUDGE CHARLES N. DORSEY

This matter is before the Court on a quiet title action on behalf of Ahmad S. Ibrahim and also on Mohammed Albosaber's actions for specific performance and tortious interference. The case has been submitted on briefs. For the reasons stated, the Court finds that any cloud on Ibrahim's title is removed and Albosaber's requests are both denied.

*Facts*

George Pannell and Francis Banks owned the property located at 603, 605, and 607 11th Street in Roanoke City. Pannell's Compl. ¶ 2; Albosaber's Compl. ¶¶ 1-2. Although there are three street addresses, the property is a single parcel and building that cannot be divided or conveyed separately. Albosaber's Mem. 2, 4; Ibrahim's Mem. 2; Albosaber's Compl., Ex. B (Ibrahim Contract 1). By deed dated January 16, 1990, Pannell and Banks conveyed this property to themselves as tenants in common during the liquidation of B&P Enterprises, Inc. Pannell's Compl. ¶ 2; Albosaber's Compl. ¶ 2. Pannell and Banks each claim a one-half undivided interest in the property. Pannell's Compl. ¶ 1; Albosaber's Compl. ¶ 2; Pannell's Answer ¶ A.1; Ibrahim's Answer, Ex. 3 (Ibrahim Am. Contract 1); Albosaber's Mem. 1; Ibrahim's Mem. 1-2. Pannell leased 603 and 605, while Banks leased 607. Albosaber's Mem. 2; Ibrahim's Mem. 1. Neither Pannell nor Banks signed the other's lease agreements. Albosaber's Mem. 2; *see also* Ibrahim's Answer, Ex. 1 (Lease Agreement).

Pannell entered a five-year lease agreement, dated February 1, 2007, with Ahmad Ibrahim for 603 and 605 (Ibrahim's Answer, Ex. I (Lease Agreement ¶ 1)), which Ibrahim had been leasing from Pannell for about thirteen years. Ibrahim's Mem. 1. Banks was not a party to this lease agreement. Ibrahim's Answer, Ex. 1 (Lease Agreement ¶ 1). Ibrahim was to use 603 for storage purposes and 605 for a grocery or convenience store. Ibrahim's Answer, Ex. 1 (Lease Agreement ¶¶ 2-3); Ibrahim's Mem. 1. Paragraph 9 of the lease agreement provided Ibrahim with a right of first refusal for the leased premises, stating:

> In the event that Pannell decides to sell the subject premises, he shall grant Ibrahim the right of first refusal. The sales price shall be the current fair market value, and Ibrahim shall have 60 days to purchase the premises after receiving the notice of sale from Pannell.

Ibrahim's Answer, Ex. 1 (Lease Agreement ¶ 9).

Banks leased 607 to Mohammed Albosaber, who used the unit to run a clothing store, which he has been doing there for about eight years. Ibrahim's Mem. 1-2. Similarly, Pannell was not a party to the lease agreement between Banks and Albosaber. Albosaber's Mem. 2.

Albosaber notes in his brief that Banks's son stated that Pannell approached Banks in November 2007 with an offer from Ibrahim to purchase the entire property for $70,000, which Banks refused. This offer is not

mentioned elsewhere in the parties' filings. Albosaber then notes that Banks sent his son to see if Albosaber was interested in purchasing the property, and Albosaber offered $74,000 for it. Albosaber claims that Pannell told Banks that Ibrahim was not interested in purchasing the property at that price, but this also is mentioned only in Albosaber's brief, and Albosaber does not argue that Ibrahim waived his right of first refusal.

On November 24, 2007, Ibrahim paid Pannell $1,000 as a down payment apparently to purchase the property, which is referred to in part of a hand-written receipt as "my [Pannell's] building located at 605 11th Street, N.W. Roanoke, Va.," for a price of $50,000. Ibrahim's Affirmative Defense ¶ 3, Ex. 2 (Receipt). Ibrahim and Pannell signed the hand-written receipt and apparently placed their thumbprints in ink on the paper in order to show that this down payment had been made. *See* Ibrahim's Answer, Ex. 2 (Receipt). There are no other terms or descriptions written on the receipt for the sale of the property, and Banks did not sign the receipt, nor is he mentioned on it. *See id.* The receipt appears to have two different sections, but Ibrahim claims that this transaction was an exercise of his "option" to purchase, and constituted a contract for the sale of part of the property to Ibrahim. Ibrahim's Affirmative Defense ¶ 3; Ibrahim's Mem. 2, 5; *see also* Ibrahim's Countercl. ¶¶ 3-8. Pannell likewise treats this receipt as a contract for the sale of part of the property. Albosaber's Compl., Ex. B (Ibrahim Contract 1 ("Whereas Seller signed a contract to sell that parcel located at 605 11th Street, N.W., to Buyer")); Ibrahim's Answer, Ex. 3 (Ibrahim Amended Contract I).

Ibrahim alleges that Albosaber "knew that Ibrahim had an option to purchase in his lease," and knew of Ibrahim's "impending purchase," because Ibrahim had discussed with Albosaber the possibility of buying the entire property together. Ibrahim's Mem. 2; Pannell's Mem. 1. Albosaber, however, claims that he was "totally unaware" of Ibrahim's right of first refusal or of any contract between Ibrahim and Pannell for the purchase of the property until Albosaber examined the title to the property. By Albosaber's account, it was Banks's son who approached Albosaber about buying the property. Albosaber's Mem. 3.

Despite Pannell signing the receipt with Ibrahim, he later signed a contract with Banks and Albosaber for the sale of the entire property for $74,000 to Albosaber. Albosaber placed a $500 deposit for the purchase into escrow. Albosaber's Mem. 2; Albosaber's Compl. ¶ 3, Ex. A (Albosaber Contract ¶ 3). Pannell claims that he did not realize he was signing a contract to sell his interest in the property to Albosaber (Ibrahim's Mem. 2), but that he mistakenly thought the contract was for the sale of part of the property

(presumably 607) to Albosaber, and for the sale of the other part (presumably 603 and 605) to Ibrahim. Ibrahim's name is not included anywhere in the contract. Further, the property to be conveyed to Albosaber is described in the second paragraph as 603, 605, and 607, and the third paragraph states the purchase price as being $74,000, which would be for the entire property. Pannell's Answer ¶ 1; Albosaber's Compl., Ex. B (Ibrahim Contract 3); Ibrahim's Answer. Ex. 3 (Ibrahim Amended Contract 3).

The closing for the sale to Albosaber, as set forth in the contract, was January 14, 2008, Albosaber's Compl., Ex. A (Albosaber Contract ¶ 12), but the purchase was never closed and thus the property never conveyed to Albosaber. It is not clear exactly why the closing did not take place or whether either party made an effort to close at that time. However, Pannell claims that there is no evidence that Albosaber made any attempt to close on that date. Pannell's Mem. 2. Also, since Albosaber claims that he was unaware of any contract between Ibrahim and Pannell for the purchase of the property until Albosaber examined the title to the property in his purchase effort, Albosaber's Mem. 3, it seems that Albosaber must not have examined the title to the property until after the closing date set forth in his contract, which is when a contract between Pannell and Ibrahim, recorded on January 22, 2008, in the Clerk's Office, would have been found. *See* Albosaber's Compl, Ex. B (Ibrahim Contract); Ibrahim's Answer ¶¶ 4-6.

Shortly after the January 14, 2008, closing date for the sale to Albosaber had passed, Pannell entered into a contract with Ibrahim for the sale of his interest in the whole property, not just for the sale of 603 and 605, nor just for Pannell's interest in 603 and 605, on January 21, 2008, and this contract for sale was recorded in the Roanoke City Clerk's Office on the following day, January 22, 2008. Albosaber's Compl., Ex. B (Ibrahim Contract); Ibrahim's Answer ¶¶ 4-6. The contract was made in connection with Ibrahim's right of first refusal from his February 1, 2007, lease agreement with Pannell, and in connection with the alleged contract formed between Pannell and Ibrahim on November 24, 2007. Pannell sold his interest in the whole property, because Pannell had found out that 603 and 605 could not be conveyed separately from 607. Albosaber's Compl., Ex. B (Ibrahim Contract 1). Ibrahim states that the $1,000 down payment made to Pannell on November 24, 2007, with the thumb printed receipt is the same $1,000 payment acknowledged in this contract. Ibrahim's Affirmative Defense ¶ 3; *see also* Albosaber's Compl., Ex. B (Ibrahim Contract 1). The contract also acknowledges that Pannell had "mistakenly signed a contract to sell the subject real estate to another party [Albosaber] thinking such other party was the Buyer herein [Ibrahim] after signing the aforesaid contracts with Buyer."

Albosaber's Compl., Ex. B (Ibrahim Contract 3). The "aforesaid contracts" appears to refer to the lease agreement and the receipt for the $1,000 down payment. *See id.* 1; Ibrahim's Answer, Ex. 3 (Ibrahim Amended Contract 1). The contract then provides that Pannell would therefore pay the costs of litigation to establish the priority of Ibrahim's contract and the percentage of his undivided interest. Albosaber's Compl., Ex. B (Ibrahim Contract 4).

The contract between Ibrahim and Pannell was amended on February 21, 2008, in order to show that Pannell was conveying a one-half undivided interest in the property, which percentage had been undetermined in the initial contract and to set the purchase price in proportion to the interest being conveyed. Ibrahim's Answer ¶ 5, Ex. 3 (Ibrahim Amended Contract). The value of the entire property was set at $74,000, which is the exact amount that Albosaber had offered in his contract to purchase the property, and thus Ibrahim was to purchase Pannell's one-half undivided interest for $37,000. Ibrahim's Answer, Ex. 3 (Ibrahim Amended Contract 1). Pannell and Ibrahim closed on the sale, and recorded a general warranty deed, reflecting the purchase price of $37,000, on February 21, 2008. Albosaber's Compl., Ex. C (Deed); Ibrahim's Answer ¶ 7, Ex. 3 (Ibrahim Amended Contract 2). The deed is dated February 13, 2008. Albosaber's Compl., Ex. C (Deed); Pannell's Compl. ¶ 1.

The amended contract and an escrow agreement signed along with it provide that $30,000 of the purchase money will be held in escrow until title as to Ibrahim's one-half undivided interest in the property is cleared by establishing the percentage of interest held in the property and the precedence or priority of Ibrahim's contract over Albosaber's contract. The money held in escrow is to be used for attorney's fees and court costs associated with this. Ibrahim's Answer, Ex. 3 (Ibrahim Amended Contract 2-4; Ibrahim Escrow Agreement). The escrow agreement states that "Charles Allen, escrow agent and Attorney on behalf of [Pannell], agrees to file suit on behalf of [Pannell] and for the benefit of [Ibrahim] in order to clear title as to [Ibrahim's] one-half undivided interest in the subject real estate." Ibrahim's Answer, Ex. 3 (Ibrahim Escrow Agreement). The amended contract further states that "[Pannell] acknowledges and agrees to be responsible for any fees and establishing the priority of this contract in the event that it is contested by Mohammed Albosaber, and will indemnify and hold harmless [Ibrahim] for any claim made against [Ibrahim] as a result of [Ibrahim] entering this contract." Ibrahim's Answer, Ex. 3 (Ibrahim Amended Contract 3-4).

In sum, the February 1, 2007, lease agreement between Ibrahim and Pannell for 603 and 605 purported to give Ibrahim a right of first refusal to purchase the property leased. Ibrahim paid Pannell a $1,000 down payment on

November 24, 2007, to purchase the property he was leasing from Pannell for $50,000. Ibrahim and Pannell claim that the signed handwritten receipt for this payment was a contract for the sale of the property, and Ibrahim claims that this transaction was an exercise of his option to purchase from the lease. Pannell then later mistakenly entered into a contract on December 28, 2007, with Albosaber and Banks for the sale of the entire property for $74,000 to Albosaber. The closing date in Albosaber's contract was set for January 14, 2008, but the closing did not take place. Pannell then entered another contract with Ibrahim on January 21, 2008, to sell Ibrahim his interest in the entire property on the same terms as Albosaber's offer in connection with Ibrahim's right of first refusal and with the prior contract, using the $1,000 down payment from November 24, 2007, for the purchase. The January 21, 2008, contract was recorded in the Clerk's Office the following day on January 22, 2008; a general warranty deed for the conveyance from Pannell to Ibrahim was signed on February 13, 2008; and an amended contract to the January 21, 2008, contract with Ibrahim and an escrow agreement to use the purchase money to first establish and defend Ibrahim's title was signed on February 21, 2008, which is the same date that the deed for the conveyance was recorded in the Clerk's Office.

On March 28, 2008, Pannell filed his Complaint against Banks and Albosaber in order to quiet title in this matter, asking this Court to determine that the contract for the conveyance from Pannell to Ibrahim has priority over the contract between Pannell, Banks, and Albosaber. Ibrahim was not a party to this action brought by Pannell. Shortly thereafter, on March 31, 2008, Albosaber filed his Complaint requesting specific performance by Pannell, Banks, and Ibrahim on the December 28, 2007, contract between Albosaber, Banks, and Pannell for the sale of the property to Albosaber and asking for damages in the amount of $50,000 plus costs from Pannell and Ibrahim for loss of business income and attorney's fees incurred as a result of Pannell's and Ibrahim's alleged tortious interference. Appropriate responsive pleadings were filed by all parties.

*Analysis*

Pannell's request to quiet title is granted. The Court finds that the conveyance and the contract for the conveyance of his interest in the property to Ibrahim take precedence over the contract Pannell had with Albosaber.

The parties agree that Banks and Pannell each have an undivided one half interest in the subject property. Further, the Supreme Court of Virginia has stated that "tenants in common are presumed to have equal ownership in

the absence of proof to the contrary," *Brantley v. Karas*, 220 Va. 489, 493, 260 S.E.2d 189, 192 (1979), and thus, "[w]here two persons take title to land, in the absence of proof to the contrary, they are entitled to the land in equal proportions." *Carter v. Carter*, 215 Va. 475, 482, 211 S.E.2d 253, 258 (1975). Here, Banks and Pannell took title to the property as tenants in common.

Pannell's conveyance of his one-half undivided interest in the whole property to Ibrahim and the contract for that conveyance has priority over Albosaber's December 28, 2007, contract because Ibrahim had a right of first refusal for part of the property in his February 1, 2007, lease agreement with Pannell. Alternatively, the contract established on November 24, 2007, between Pannell and Ibrahim for the purchase of part of the property is superior to Albosaber's contract and closing has occurred, clearly establishing Ibrahim's title to the property. Va. Code Ann. § 55-96(A)(1) (2009); Virginia being a "race notice" state. *See Duty v. Duty*, 276 Va. 298, 304, 661 S.E.2d 476, 479-80 (2008).

In explaining a right of first refusal, the Supreme Court of Virginia stated in *Landa v. Century 21 Simmons & Co.*, "a right of first refusal is inserted in a contract for the benefit of the person who is given the right and that it must, therefore, be interpreted with that purpose in mind." *Landa v. Century 21 Simmons & Co.*, 237 Va. 374, 380, 377 S.E.2d 416, 419 (1989). A right of first refusal "limits the right of the owner to dispose freely of his property by compelling him to offer it first to the party who has the first right to buy." *Id.* at 381, 377 S.E.2d at 420 (quoting 11 S. Williston, *Williston on Contracts* § 1441A (3d ed. 1968)). Thus, "where a right of first refusal is involved, when an owner receives an offer[,] the owner cannot accept that offer without first offering it to the holder of the right of refusal 'on the same terms.' If he does not do this, the owner is in breach." *Id.* (citing 1-A A. Corbin, *Corbin on Contracts* § 261 (1963)).

In the present case, Pannell had given Ibrahim a right of first refusal to purchase part of the property before Pannell entered into the contract to sell his interest to Albosaber. Pannell was limited in his right to "dispose freely of his property" such that he could not accept Albosaber's offer to purchase the property unless Pannell first offered the property to Ibrahim on those terms and unless Ibrahim refused that offer. This did not happen. Thus, when Pannell entered into the contract to sell the property to Albosaber, Pannell breached his agreement with Ibrahim to give Ibrahim the right of first refusal. Had Pannell taken no further action at that point or acted otherwise than he did, then Ibrahim could have required specific performance from Pannell on his right of first refusal, forcing Pannell to convey the property to him.

Therefore, Pannell did on his own what this Court would have required him to do by offering and conveying the property to Ibrahim. Ibrahim still had a right to purchase that part of the property offered to him in his right of first refusal, even though Albosaber's offer was to purchase more than just that part of the property. Since Ibrahim had a right to purchase the property despite Pannell's contract with Albosaber, Ibrahim has not taken the property subject to Pannell's contract with Albosaber, as Albosaber argues, and Ibrahim is therefore not required to perform Albosaber's contract by selling his interest in the property to Albosaber.

In sum, whether, because of his right of first refusal or because of an earlier contract, Ibrahim had a right to demand that Pannell convey to him what interest Pannell had in the property despite Pannell's contract with Albosaber. Therefore, Ibrahim's title is quieted, and any cloud on the deed arising from Pannell's contract with Albosaber is removed.

Albosaber makes two claims in his Complaint: one for specific performance of his contract for the sale of the property, and the other for tortious interference by Ibrahim and Pannell of that contract. Albosaber asks this Court to require Banks and Ibrahim, arguing that Ibrahim took title subject to Pannell's contract with Albosaber, to convey the entire property over to him in performance of his contract with Banks and Pannell. Albosaber's Compl. ¶ 12; Albosaber's Mem. 5.

The Supreme Court of Virginia has stated that "[s]pecific performance of a contract is not a matter of right, but rests in the discretion of the trial court to be granted or refused according to established principles and the facts of each case." *Shepherd v. Davis*, 265 Va. 108, 122, 574 S.E.2d 514, 522 (2003) (quoting *Hawks v. Sparks*, 204 Va. 717, 720, 133 S.E.2d 536, 539 (1963)). The Court has further explained that:

> [i]n general, [specific performance] will be used to promote an exact measure of justice, as nearly as is possible, and will be refused when it will produce injustice. It is never granted unless it is entirely in accordance with equity and good conscience. . . . When the contract sought to be enforced, has been proven by competent and satisfactory evidence, and there is nothing to indicate that its enforcement would be inequitable to a defendant, but will work injury and damage to the other party if it should be refused, in the absence of fraud, misapprehension, or mistake, relief will be granted by specific enforcement.

*First Nat'l Exchange Bank v. Roanoke Oil Co.*, 169 Va. 99, 117, 192 S.E. 764, 771 (1937).

Here, specific performance is not granted. Ibrahim is not required to perform Pannell's contract with Albosaber by conveying his interest in the property to Albosaber. Pannell was in breach of his contract with Ibrahim, whether by the right of first refusal or through the other contract formed on November 24, 2007, when he agreed to sell the property to Albosaber; therefore, Pannell was not able to convey the property to Albosaber. Ibrahim had a superior right to Albosaber and is not subject to Pannell's contract with Albosaber. As a result, specific performance as to Ibrahim is denied.

Banks is also not required to perform his contract with Albosaber. The Supreme Court of Virginia has stated "the function of the court is to construe the contract made by the parties, not to make a contract for them." *Cave Hill Corp. v. Hiers*, 264 Va. 640, 646, 570 S.E.2d 790, 793 (2002). Furthermore, "[i]t is the court's duty to declare what the instrument itself says." *Ames v. American Nat'l Bank*, 163 Va. 1, 38, 176 S.E. 204, 216 (1934).

Here, the property contract with Albosaber was for the entire property. *Id.* Pannell had breached his contract with Ibrahim and did not have the capacity to convey his interest to Albosaber. Since Ibrahim is entitled to one half of the property, the Court will not rewrite the contract. Therefore, Albosaber is not entitled to have Banks perform his part of the contract and his $500 deposit must be returned.

Albosaber's claim for tortious interference by Ibrahim and Pannell is also denied. Albosaber argues that Ibrahim and Pannell intentionally caused a breach or termination of Albosaber's contract with Pannell and Banks and that Albosaber has suffered a loss of business income and incurred attorney's fees as a consequence.

The Supreme Court of Virginia has stated that:

[t]he elements required for a *prima facie* showing of [tortious interference] are: (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.

*Chaves v. Johnson*, 230 Va. 112, 120, 335 S.E.2d 97, 102 (1985).

If the plaintiff proves tortious interference, the defendant may refute by showing that the interference was privileged or justified. *Duggin v. Adams*, 234 Va. 221, 226, 360 S.E.2d 832, 835-36 (1987).

As stated above, Ibrahim has shown that his "interference," if any, was justified because Ibrahim interfered as a matter of right, seeking performance on his right of first refusal or his earlier contract. Thus, Ibrahim has stated a valid affirmative defense to Albosaber's claim of tortious interference. Additionally, neither Pannell nor Ibrahim interfered with Banks's performing the contract, and thus there can be no claim for tortious interference against Pannell for his own breach, since he was a party to the contract.

Further, there is no evidence that Albosaber suffered any damage or loss of business income as a result of Pannell's withholding his interest. Therefore, Albosaber's claim for tortious interference is denied, and Ibrahim's Affirmative Defense to this claim is granted.

## Conclusion

The Court finds that Ibrahim's title is valid and is not subject to Pannell's contract with Albosaber. Therefore, any cloud created by Pannell's contract with Albosaber is removed. Additionally, specific performance on Albosaber's contract is denied. Albosaber may terminate the contract and receive his $500 down payment back. Albosaber's claim for tortious interference by Ibrahim or Pannell is denied.